THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES BROWN, Defendant-Appellant.

First District (6th Division) No. 1—86—3448

Opinion filed June 8, 1990.

Randolph N. Stone, Public Defender, of Chicago (Julia M. Gentile, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Paul Gliatta, and Catherine Bernard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

After a bench trial the defendant, James Brown, was convicted of attempted 'murder, aggravated battery and aggravated battery of a child. The convictions were based on acts committed by the defendant against Natasha Gibbs (Natasha) beginning in November 1984 and continuing through January 1985. The judge merged the aggravated battery convictions with the attempted murder conviction and, after finding the defendant eligible for an extended-term sentence, sentenced the defendant to 60 years' imprisonment and to three years' mandatory supervised release.

The defendant first contends that the evidence does not establish the element of intent to kill necessary to sustain a conviction of at-

tempted murder. A comparatively detailed recitation of the evidence is required.

The defendant was almost 26 years old; he was six feet five inches tall; he was unemployed. Victoria Gibbs (Gibbs), the victim's mother, was approximately 24 or 25 years old; she was five feet one inch tall and weighed 89 pounds.

The defendant first met Victoria Gibbs in 1983. She and her three children, Latoya, Anthony and Natasha, moved into the apartment of his friends at 1121 South Mozart in Chicago. The defendant lived with her. Also living in the apartment were Lily Brawner and her boyfriend, Wilbur Page, Jr.; Lily's two sons, Laverick and Walter Brawner, and Walter's girlfriend, Shirley McLaurin.

The defendant, Gibbs and her children occupied one bedroom in the back of the apartment. She and the defendant shared a bed while the children slept on a mattress on the floor of their bedroom. They ate in the bedroom.

In November 1984 the Gibbs children were all strong and healthy. However, Gibbs, who was five months pregnant, suffered from morning sickness and anemia. Latoya was five years old; Anthony was 2½ years old; Natasha was approximately 16 months old.

The defendant called himself the "boss" and "ran everything" within the household. He disciplined and punished the children and beat them for wetting their clothes. He used to force Latoya and Anthony to stand in opposite corners of the room on one foot from one-half hour to two hours at a time. He would hit Latoya but not as hard as he hit Anthony. He would whip Anthony with a belt whenever Anthony was unable to stand on one foot for the required length of time. He would strike Anthony with his fist and hit him in the chest as hard as he could; Anthony would fall back onto the dresser. The defendant would also whip Anthony with his belt and strike him on the head with it.

Walter Brawner testified that the defendant beat Gibbs and the children all the time, he beat Gibbs every day. He slapped her and hit her in the eye and mouth with both his fists and open hand. He left hand prints on her face and bruises on her back. He would jump on her even though she was pregnant and tried to make her stand in the corner like the children. On another occasion he tied her hands behind her back and struck her repeatedly in the face with a wire clothes hanger.

The defendant insisted on feeding Natasha. Although Gibbs fed Latoya and Anthony, the defendant would not let her feed Natasha; he beat Gibbs when she did feed Natasha. Because Natasha would not

eat all the time, he force-fed her. He would grab Natasha off the floor, throw her down, place his left hand on the top of her head, yank her head back, put the food on the spoon and then, while her head was back, force her to eat. When Natasha would not eat, the defendant would get angry and throw her down; Natasha would cry or just lie there. He fed her in this manner each day.

Laverick Brawner testified that the defendant would put his hand on the top of Natasha's head and bend it approximately to her back. While her head was still back, he would take the hand that he placed on top of her head and place it underneath her jaw. Then he would place his hand on either side of her checks and squeeze, causing her lips to purse. He would take a large spoon of food and put it inside her mouth. If she spit out the food, the defendant would slap her with an open hand across the face and knock her down. She would get up, and the defendant would try again, using the same method. He whipped Natasha with a belt on her arms and legs whenever she would spit out the food. After each whipping, he would try to feed her more. When she started to cry, the defendant threw her down on the mattress on the floor in their bedroom and closed the door.

He also assumed the responsibility for Natasha's toilet training. He grabbed her every morning, threw her down on the training toilet in the bedroom and told her she should not move. When she would try to get up, he would tie her to the training toilet. He tied her hands to the arms of the toilet chair with an extension cord; he used a belt around her waist so that she could be tied down completely; and he tied both her feet together with wire or shoestrings so that she was unable to get up. He made her sit there for an hour or two; he would just let her sit there and cry. If she tried to get up, he struck her repeatedly with his hand across her face and back. On one occasion he struck her in the face with a wet towel two or three times.

From November 1984 until January 1985, he tossed Natasha into the air several times a day. At times her head would actually hit the ceiling. He would either catch her on descent or he would allow her to fall to the mattress on the floor. On one occasion, Shirley McLaurin saw the defendant throw Natasha up to the ceiling a couple of times; Natasha's head hit the ceiling twice. Then the defendant shook her violently so that her head and feet were jerked backward and forward. On another occasion, Laverick Brawner saw the defendant throw Natasha up three or four times and heard her head hit the ceiling each time. The defendant caught her every time except the last time when he allowed her to fall, face first, to the mattress on the floor.

He also whipped Natasha's legs and arms with a belt. According

to Shirley McLaurin, Natasha did not act right after the defendant started whipping her. On one occasion about two weeks after the defendant and Gibbs moved in, the defendant struck Natasha in the face with an open hand two or three times, causing her to fall to the floor. Then the defendant walked away as she lay crying on the floor. On another occasion in late December or early January, the defendant whipped her with a belt, striking her any place the belt would land. On two or three occasions, the defendant hit Natasha across the face with the end of the belt.

Whenever Gibbs objected to the defendant's treatment of Natasha, he threatened her and knocked her around. He hit her every time she attempted to feed Natasha or to untie her from the training toilet.

By January 1985, Natasha was in a weakened condition. She could neither stand nor walk without holding onto the walls. When she first came to the Mozart apartment, she was a healthy baby. She smiled and laughed all the time; she was playful; she walked and talked and ate normally; however, she did not act right after the defendant started whipping her. In January 1985 she would not talk, play, smile or laugh; she would not eat well. About the last week before her hospitalization her face began to twitch involuntarily.

On January 20, 1985, Walter saw the defendant throw Natasha into the air; Natasha struck her head on the ceiling with such force that "everything was bunched up." She looked like she was hurting. On one of the occasions that the defendant threw Natasha into the air, he allowed her to fall from the ceiling to the wooden floor 10 feet below.

After being force-fed, Natasha went limp and she could not sit up right; she could not support herself; she would not even cry. The defendant responded by shaking her violently above the shoulders; her head went all the way back, back and forth. She was weak and began changing colors; she was gasping for breath.

On January 23, 1985, the defendant again force-fed Natasha and tied her to the training toilet. On January 24, Natasha stopped breathing. Gibbs telephoned the paramedics, and the defendant attempted to revive Natasha. He brought her into the bathroom, where he threw water on her, slapped her face, pressed down on her chest and attempted to give her artificial respiration. Gibbs called for medical assistance, and paramedics took Natasha to Mt. Sinai Hospital.

Before the paramedics arrived, the defendant instructed Gibbs to tell the doctors that her son, Anthony, had jumped on Natasha. At the hospital he again told her to tell the doctors that Anthony had jumped

on Natasha. He threatened to harm Gibbs and her children if she did not follow his instructions. He also told the other persons who lived in the apartment either to deny knowing the cause of Natasha's injuries or to say that Anthony jumped off the bed onto Natasha.

On January 25 Natasha was transferred to Rush-Presbyterian-St. Luke's Hospital. She was diagnosed as suffering from a functional severing of the spinal cord which resulted from a severe bruising, contusion and swelling of the cord. She was deprived of all muscle control below the neck, including a complete loss of the muscles needed for respiration. The bruising and swelling of her brain stem severely damaged the modulation of other important functions such as blood pressure, heart performance and temperature. Medical testimony established that the injury occurred less than two weeks before her hospitalization and that it could have been caused by throwing her into the air so that she hit the ceiling or by forcefully throwing her head backwards by force-feeding. In the opinion of the expert, a two- or three-year-old child could not have caused the injury by jumping onto Natasha's back.

Natasha also suffered from a fracture of her spine between the fourth and fifth vertebrae which were located in her mid-back. Had there been no spinal cord injury, the most severe consequences of the fractured vertebrae would have been complete paralysis of the upper and lower extremities and most of the trunk muscles; however, respiratory damage would probably have been avoided. The injury to the vertebrae could have been caused by a fall from a height of six feet or more and would have limited Natasha's ability to walk.

She also suffered a fracture of the clavicle or collar bone. That injury was two to four weeks old at the time of her hospitalization, and it would have temporarily limited her mobility. It could have resulted only from a very direct and forceful blow to the bone. It could have been caused by a fall onto a fairly firm surface from a height of six feet or more, but it could not have occurred by one child falling on her back.

As a result of the injuries, Natasha required very "aggressive and heroic" therapy to save her life. At every moment during the first 48 hours, it was far more likely that Natasha would not survive.

It was established that she will never breathe without support and will, most likely, require 24-hour nursing care. At the time of the trial she could eat only soft foods, creamy soups and liquids. She could blink her eyes, talk, swallow, wrinkle her nose and move her head from side to side. But if her head fell forward or to the side completely, she could not bring it back; rolled-up baby blankets helped to

keep her head in place. She had no control over her bladder or bowels, and her trachea needed to be suctioned at least every three hours.

Over the defendant's objection, the judge permitted evidence of acts committed by the defendant against other children. From November 1978 through June 11, 1979, Cheryl Caruth lived with the defendant along with her 13-year-old sister, Evelyn; her six-year-old son, Atland; and her 19-month-old daughter, Rhonda Horton. Cheryl and Atland testified for the State.

The first night that they all lived together, the defendant sat on Atland's head and beat his lower body with an extension cord. The defendant beat Atland almost every two days. During Easter week in April 1979 the defendant whipped Atland across the back, arms, buttocks and legs with an extension cord because he thought that Atland had opened an Easter basket. When Atland was sent to school, he could barely walk; school officials took him to St. Bernard's Hospital. As a result of the beating Atland suffered multiple abrasions over his thighs, arms, back, buttocks, legs and neck. Medical personnel also noted numerous old scars with the same pattern of elongated loops as the new marks.

On June 6, 1979, the defendant beat 13-year-old Evelyn, striking her with his fist and knocking her to the floor. He picked her up by the ankles and swung her into a wall, and then kicked her in the side. He hit her on the head with a skillet, struck her legs and back with a metal mop and sliced around her throat with a knife. He also hit her in the stomach, ear and mouth with a metal burglar bar. She lost consciousness and control of her bladder. Cheryl Caruth intervened, brought Evelyn into the bathroom and tried to revive her. The defendant claimed that Evelyn was "faking" and hit her in the face with a brush, knocking out some of her teeth. Evelyn was taken to Cook County Hospital. As a result of the beating Evelyn suffered blunt trauma to the face and torso and decreased renal function. She had bruises all over her face, a swollen eye, a bruised chest, a tender abdomen, swollen feet and hands, and blood in her urine.

On several occasions the defendant withheld food from Cheryl's daughter, Rhonda; he said she was getting too fat. He force-fed Rhonda by pulling her entire head backwards in short, quick, jerking movements, shoving food inside her mouth. On several other occasions, he sucked on Rhonda's cheeks causing her skin to turn black-and-blue. He also chewed on Rhonda's arm from her wrist to her elbow until the skin appeared similar to that on her face. He threw Rhonda up into the air almost every day. On one occasion Rhonda's

nose started bleeding, but the defendant would not stop. Her head often came close to the ceiling. Cheryl saw Rhonda's head actually hit the ceiling once; Atland saw it happen two or three times.

The defendant made Rhonda sit on a toilet training chair often, sometimes for hours at a time. On the morning of June 11, 1979, he struck Rhonda about five or six times with his hands and with his slippers; he ordered her to sit on the toilet training chair for hours and then put her to bed. At about 11 p.m. he began throwing Rhonda into the air. He held her by her feet and swung her up and down in circles. Her head hit a radiator. Atland saw Rhonda's head hit the radiator; he heard a thump; and he heard the radiator make a ringing sound. Cheryl heard the defendant telling Rhonda to wake up and to get up. He brought Rhonda to Cheryl in the bathroom. He splashed water on her and attempted mouth-to-mouth resuscitation. He took Rhonda to the hospital. While on the way to the hospital, he told Cheryl to say that Rhonda fell while Cheryl was with her in the bathroom. Rhonda died at the hospital three days later from cranial cerebral injury and associated bruises. The defendant was charged with the murder of Rhonda. Nine months after his arrest, he pleaded guilty to involuntary manslaughter and served approximately three months' imprisonment.

The defendant testified that he never did anything more than spank Natasha's hand. He also admitted playing with her by shaking her from side to side and by tossing her into the air on a couple of occasions. However, he denied that her head ever came close to touching the ceiling, which was very high. He also denied ever failing to catch her on the descent. He said that he helped toilet-train Natasha but denied ever tying her to the chair. He testified that Gibbs frequently struck Anthony and Natasha and that it was Gibbs who caused Natasha to be hospitalized. He saw Gibbs striking Natasha in the back with her fist while Natasha was lying facedown on a pillow. Gibbs was pushing Natasha's face into the pillow, holding the back of her neck with one hand and hitting her in the back with the other hand. He pushed Gibbs aside and picked Natasha up; Natasha showed no physical signs of injury until she lost consciousness several days later. He told people that Natasha was injured when Anthony jumped on her in order to protect Gibbs; she was afraid and he told her not to get involved.

He testified that he met Cheryl Caruth in 1978 after he befriended her abandoned children. After Cheryl and her children moved in with him and his mother, he and his mother cared for the children. Cheryl was drunk almost every day. He said that he was ar-

rested for the aggravated battery of Atland Caruth; however, although he admitted slapping Atland's hand on occasion, he denied ever striking him with a belt or an extension cord. Cheryl, who was pregnant at the time, caused Altand's injuries; Cheryl hit him with a belt. He told the police that, while he hit Atland before he went to school, Atland injured himself when he fell down and cut himself. He denied telling the police that he had hit Atland with a belt.

He testified that he never struck Rhonda. Although he admitted striking Evelyn in the face, causing her to fall on an overturned footstool, he said that Cheryl, while pregnant, caused Evelyn to be hospitalized by beating her with a mop handle. He also testified that Cheryl, while intoxicated, caused Rhonda to fall backwards and hit her head on the radiator which resulted in her death. He tried to revive Rhonda and brought her to the hospital. He ultimately pleaded guilty to the involuntary manslaughter of Rhonda and the aggravated battery of Evelyn so that Cheryl would not be prosecuted for perjury.

Several other witnesses testified for the defendant. They were either friends or relatives. The collective import of their testimony was that the defendant was attentive and caring to the Gibbs and Caruth children and that Victoria Gibbs and Cheryl Caruth were derelict and abusive mothers.

Dr. Richard Penn, a specialist in pediatric neurosurgery with Rush-Presbyterian-St. Luke's Hospital, testified in rebuttal that Natasha suffered from a dysfunction of the spinal cord in the high cervical area, a thoracic fracture of the fourth and fifth vertebrae and a clavicular injury. While the thoracic fracture of Natasha's vertebrae could not have been caused by violent force-feeding, it was his opinion that the fracture could have been caused by throwing Natasha into the air so that her head struck the ceiling or by causing her to fall more than six feet onto a hard surface. On the other hand, the high cervical spinal cord injury could have been caused either by force-feeding, by throwing her into the air so that her head hit the ceiling or by causing her to fall from "a sizeable height." Neither the thoracic vertebrae fractures nor the high cervical spinal cord injury could have been caused by striking a child in the back or neck or by forcing a child's head into a pillow.

Officer William Jordan testified that the defendant admitted that he had hit Atland with a belt once but that no welts had been made. The defendant told him that Atland had fallen.

In his findings, the judge made direct and candid expressions of his view of the credibility of the witnesses. In sum, he did not believe the defendant or his witnesses; he did believe Atland Caruth, Walter

Brawner, Shirley McLaurin and Laverick Brawner. The defendant makes no issue of the judge's determination of the credibility of the witnesses; nor does he claim that the evidence does not establish that his actions caused the injuries suffered by Natasha. Therefore, a resolution of the question of the sufficiency of the evidence requires that we accept the State's evidence as true.

■ ■ The State must prove that the defendant possessed the specific intent to kill Natasha Gibbs and that he did an act which constituted a substantial step toward killing her. (*People v. Myers* (1981), 85 Ill. 2d 281, 426 N.E.2d 535.) Because the specific intent to kill is a state of mind, where it is not admitted, it may be inferred from the character of the assault and the overall circumstances of the case. (*People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089.) A conviction will be sustained if the defendant is actuated "by wanton and reckless disregard of human life that denotes malice, and the assault is made under such circumstances that, if death had ensued, the killing would have been murder." *People v. Coolidge* (1963), 26 Ill. 2d 533, 537, 187 N.E.2d 694, 696-97.

There can be no arguable claim that the overall circumstances of the case do not disclose malice against Natasha on the part of the defendant; nor, in our judgment, can there be any claim that if death had ensued, the defendant would not have been guilty of murder. In this regard, we find it particularly significant that the defendant had previously killed a small girl whom he had subjected to a general course of mistreatment strikingly similar to the course of mistreatment to which he had subjected Natasha. With that previous experience before him, the defendant would be hard put to make any claim of accident or negligence for the injuries suffered by Natasha. The defendant apparently argues that the act causing the death of Rhonda was dissimilar to the act causing the injury to Natasha because the killing of Rhonda was caused by the defendant swinging her by the heels so that her head struck a radiator, while he threw Natasha in the air so that her head struck the ceiling. That distinction between the acts is a grim nicety whose significance escapes us.

The defendant relies principally on *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270, and argues that his conduct is inconsistent with an intent to kill Natasha. In *Mitchell*, the prosecution relied primarily on the defendant's statements to the police. She told them that she had had a quarrel with her boyfriend and, in her anger, struck her daughter several times. After that beating, the child began to play and appeared normal, although bruised, when she was put in bed that night. The following day the child was "not minding and getting into

cupboards"; as a result, the defendant "became nervous" and struck the child a number of times with her open hand. She placed the child in a highchair, and the child became unconscious. The defendant placed a cool cloth on the child's head for 15 minutes and then took her to the hospital. When the police asked why she had beaten the child, she explained that she wanted to give the child away, that the child reminded the defendant of its father, whom the defendant hated, and that she was taking her anger out on the child. The supreme court reversed her conviction of attempted murder.

Factually, *Mitchell* is wide of the mark. The evidence of a frustrated, angry and truthful mother, who beat her child on two occasions and took the child to the hospital immediately, is in stark contrast to the evidence of a previously convicted child-killer who repeatedly tortured another child over a period of almost three months and then, in a display of consciousness of guilt, tried to foist responsibility on other innocent parties, just as he had done before in another case of child abuse.

The defendant also emphasizes two aspects of the evidence which, he maintains, illustrate the weakness in the State's proof. First, although he now admits that the evidence establishes that he slapped Natasha and that she became unconscious, he points to the fact that he brought her into the bathroom, threw water on her and attempted artificial respiration. He argues that this evidence "belies an intent to kill." The answer to this argument is that once the elements of attempted murder are complete, abandonment of the criminal purpose is no defense. (*People v. Myers* (1981), 85 Ill. 2d 281, 426 N.E.2d 535.) Second, he maintains that if he intended to kill Natasha, he had ample opportunity available to him and that the fact that this conduct occurred over a three-month period "negates the intent to kill." We must reject that argument also. Because the defendant did not snuff out Natasha's life in one act in November 1984 does not mean that a fact finder could not consider the defendant's entire course of conduct over a three-month period. Attempted murder may consist of a series of acts. (See *People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446.) The judge specifically held that the defendant "committed all of these acts" with the intent to injure, maim and ultimately kill Natasha "as part of a continuing pattern of child-abuse." It is clear that the judge regarded the defendant "as a sadist who preferred" to kill Natasha by degrees. *People v. Myers*, 85 Ill. 2d at 290.

 It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears that there exists a reason-

able doubt of the defendant's guilt. (*People v. Migliore* (1988), 170 Ill. App. 3d 581, 525 N.E.2d 182.) When a reviewing court is presented with a challenge to the sufficiency of evidence, the relevant standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) The judge heard all the testimony and observed the demeanor of all the witnesses; he found the defendant to be a "liar" and a "totally unbelievable witness"; and the State's witnesses to be credible. He specifically ruled that:

"[T]he defendant committed acts which constitute a substantial step towards the commission of murder and that James Brown intended to murder Natasha Gibbs and *** knew that his acts created a strong probability of death or great bodily harm to Natasha Gibbs."

It is our judgment that the record reveals that the judge, as a rational trier of fact, could have concluded that the defendant intended to commit the offense of murder; that he took a substantial step toward the commission of that crime; and that he would have succeeded had it not been for extraordinary medical measures. We must, therefore, refuse to interfere with the findings of the trial judge; in fact, we agree with his findings.

The defendant next contends that his convictions for aggravated battery must be reversed because of an alleged variance between the proof and the indictment. The first count of the indictment charged the defendant with causing Natasha bodily harm and permanent disability "by beating her about the body with a belt." The second count charged him with causing great bodily harm "by beating her about the body with a belt." The third count charged him with aggravated battery to a child "by beating her about the body with a belt and *** hands." The defendant maintains that the testimony of Dr. Penn established that the "great bodily harm" or "permanent disability" suffered by Natasha was caused by either her head striking the ceiling or by the violent force-feeding by the defendant, and that it was not caused by his beating her with a belt or his hands.

■ The State argues that since the judge merged the offenses and sentenced the defendant only for attempted murder, there is no final judgment of conviction for aggravated battery, and, therefore, the appeal of the aggravated battery convictions should not be entertained. There is support for the State's argument. (*People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481; *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.) The defendant has not responded to the

State's argument. However, the absence of a sentence for aggravated battery is not a jurisdictional defect, and we have decided to consider the appeal of the aggravated battery convictions. *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180.

■■ ■ It would serve no purpose to repeat all the evidence; suffice it to say that the evidence established great bodily harm caused by the use of a belt and the defendant's hands. The defendant struck Natasha repeatedly with his hands and a belt over a 2½-month period. By January 1985 she was so weakened that she, a previously healthy little girl, could not play, talk, laugh, or smile. She could not eat well; her face began to twitch involuntarily. She could neither stand nor walk without holding onto the walls. In our judgment a fact finder could conclude from that evidence that a 16-month-old child had suffered "great bodily harm" and that it was caused by the beatings with the belt and the hands of the defendant. (See *People v. Reynolds* (1980), 91 Ill. App. 3d 683, 415 N.E.2d 685; *People v. Cross* (1980), 84 Ill. App. 3d 868, 406 N.E.2d 66; *People v. Olmos* (1978), 67 Ill. App. 3d 281, 384 N.E.2d 853.) Moreover, the defendant's argument ignores the fact that Natasha suffered a broken collar bone in addition to the injuries to her spinal column. A broken collar bone is "great bodily harm." The defendant also ignores the proof that the severed spinal cord could have been caused by the defendant violently force-feeding Natasha. In our judgment, an injury caused by violently force-feeding a child could be considered an injury caused by the use of the defendant's hands. Even if we were to conclude that there was a variance between the proof and the indictment, we would further conclude that the variance was not material. The indictment was sufficient to apprise the defendant of the charge so that he could prepare a defense, and an acquittal would have barred any further prosecution on a charge of aggravated battery of Natasha Gibbs. *People v. Figgers* (1962), 23 Ill. 2d 516, 179 N.E.2d 626.

The defendant next argues that the court erred in permitting proof that he had abused Rhonda Horton, Atland Caruth, Evelyn Caruth and Anthony Gibbs. Before trial the defendant filed a motion *in limine*; neither the motion nor the State's response has been made part of the record. The judge ruled that the evidence of other wrongful acts was admissible to show intent, knowledge of the consequences of the defendant's acts, motive, absence of mistake and a common scheme or design in dealing with small children. The State argues in this court that the evidence showed the defendant's intent and his *modus operandi*.

■ The admissibility of evidence of other offenses rests within

the sound discretion of the trial court, and its decision will not be overturned unless a clear abuse of discretion is shown. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292.) Evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime. *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.

The threshold test is whether proof of another offense tends to prove any relevant fact. *Kimbrough* contains a comprehensive list of cases illustrating various purposes for which proof of other offenses is admissible. (*Kimbrough*, 138 Ill. App. 3d at 484-85.) *Kimbrough* points out that the various purposes identified are not the only purposes and that such evidence may be admissible for more than one purpose. (138 Ill. App. 3d at 485-86.) Among the cases listed are ones upholding admissibility to show intent and absence of accident. Evidence which shows that an event was not caused by accident tends to show that the event was caused intentionally. Evidence of another offense to show intent (or absence of accident) is based on the doctrine of chances. (2 Wigmore, *Evidence* §302 (Chadbourn rev. ed. 1979).) The basis of the rule was expressed in *Commonwealth v. Donahue* (1988), 519 Pa. 532, 549 A.2d 121, in which the defendant was charged with homicide due to child-abuse. The prosecution introduced evidence that the defendant had caused the death of another child three years earlier. The supreme court of Pennsylvania upheld the admissibility of the other offense, stating as follows:

"Thus, in order to avail itself of the accident exception to the rule that past crimes are usually not admitted into evidence, the Commonwealth must show that (1) the previous incident(s) are similar to the incident in question and (2) that a similar result obtained in both cases. The basic idea is that although two different children may, at different times, be seriously injured or killed while in a person's care, and that this may happen without his intentional conduct, as the number of such incidents grows, the likelihood that his conduct was unintentional decreases. It is merely a matter of probabilities." 519 Pa. at 543, 549 A.2d at 127.

The similarities between the defendant's acts against Rhonda and his acts against Natasha are strong ones, and the results in both cases are similar, although not identical since Rhonda died. Consequently, we have no doubt that the evidence of the acts committed by the defendant against Rhonda Horton was admissible to show the defendant's intent or, put another way, the absence of accident when he nearly caused the death of Natasha. That being so, it is un-

necessary to consider the State's argument that the evidence was admissible to establish the defendant's *modus operandi*. Although the defendant has not argued the lapse of time between the killing of Rhonda and the assaults against Natasha, we are mindful of that lapse. It is not an overriding fact that would preclude admissibility of the offense against Rhonda; it is, however, a fact which could be considered in determining the weight of the evidence. *People v. McMillan* (1980), 86 Ill. App. 3d 208, 407 N.E.2d 1137.

The defendant argues that the evidence should not have been admitted under the exception permitting proof showing absence of mistake or accident. He contends that the defense to which he testified was a denial that he force-fed Natasha or threw her into the air so that her head hit the ceiling; his defense was not that the injuries were "the result of inadvertence, mistake or other innocent event." The defendant apparently misunderstands *when* the State may introduce proof of other wrongful acts.

 █ The specific intent to kill is an element of the offense of attempted murder. Where specific intent is an element of the crime, the prosecution may introduce evidence of other offenses to establish the element of intent even if the defendant has not placed intent into question. (*United States v. Brantley* (7th Cir. 1986), 786 F.2d 1322.) When the defendant pleaded not guilty, he put the State to its proof, and it was entitled to offer all relevant evidence in its case in chief. (*People v. Botulinski* (1945), 392 Ill. 212, 64 N.E.2d 486; see also *McMichael v. State* (1978), 94 Nev. 184, 577 P.2d 398.) The State had no way of knowing whether the defendant would testify or offer any proof. Therefore, it had the right to introduce evidence which would support the conclusion that Natasha's injuries were not caused by negligence.

We turn next to the admissibility of the assault of Anthony Gibbs. We believe the evidence was admissible for two reasons. The case cited by the State, *People v. Milner* (1984), 123 Ill. App. 3d 656, 463 N.E.2d 148, is the only Illinois case we have found dealing with the propriety of proof of child abuse against a person other than the victim of the crime for which the defendant was being tried. In that case, the defendant was charged with the murder and involuntary manslaughter of his infant son. The child's body was so badly decomposed that no cause of death could be found. One of the State's theories was that the defendant had caused the child's death by violently shaking him.

The State was permitted to show that the deceased's twin sister had suffered a fractured arm and knees the previous year and that

the defendant had given the police a statement that another child had jumped off a window ledge onto his daughter, thereby injuring her. The defendant also admitted shaking the child hard enough to injure her.

In addition, the State introduced evidence that another child of the defendant had died seven years earlier. The child had been left in the defendant's care and died, according to the defendant, when the child had fallen off a bed. An autopsy indicated that the child had died from a brain hemorrhage which could have been caused from a fall, but a more common cause for such an injury would be repeated shaking. The autopsy of that child also revealed several healing fractures of the ribs which had occurred before his alleged fall.

X rays of the twin sister of the deceased revealed a spiral fracture of the arm and small chip fractures of both knees. The spiral fracture was in the same area as the one found on the boy who had died seven years earlier. A radiologist was permitted to testify that he believed those injuries were the "hallmark" of a battered child. X rays of the decedent indicated that he had healing rib fractures and a chip fracture of the left scapula, which were similar to those of his twin sister and the child that had died six years earlier.

█ The appellate court held that the prior instances of child abuse were relevant to prove a number of facts, including intent. Similarly, other jurisdictions in child-abuse cases have upheld admissibility of other acts of child abuse on the ground that the other acts tended to establish intent or absence of accident. In *State v. Morosin* (1978), 200 Neb. 62, 262 N.W.2d 194, the defendant was charged with assault based on his intent to inflict great bodily injury on the seven-month-old child of the woman with whom he lived. He also lived with his 3½-year-old son. The seven-month-old child was injured around August 3, 1975. The State was permitted to show that the defendant had abused his own son on June 15, 1975, and on about August 5, 1975. The supreme court of Nebraska upheld the admission of the evidence of the other offenses on the ground that they tended to prove criminal intent. In *State v. Riggsbee* (1984), 7 N.C. App. 167, 323 S.E.2d 502, the defendant operated a day-care facility in her home for children ranging from infant to five years of age. She was charged with the child abuse of a four-month-old child who had been in her care. The State was permitted to introduce evidence that three months earlier she had abused a seven-month-old child who had also been in her care. The court upheld admissibility on the ground that the evidence tended to show that the act for which she was on trial was not caused by an accident. (See also *Commonwealth v. Donahue*

(1988), 519 Pa. 532, 549 A.2d 121; *Limber v. State* (1978), 264 Ark. 479, 572 S.W.2d 402; *United States v. Woods* (4th Cir. 1973), 484 F.2d 127.) We conclude, therefore, that the evidence of the assault of Anthony tended to prove that the defendant intended to harm Natasha.

We believe that the evidence of the beatings of Anthony may be upheld on the additional ground that it formed part of the *res gestae* of the offense against Natasha. We note that the defendant does not claim any error in the introduction of the evidence of wrongful acts committed by the defendant against Victoria Gibbs; nor does he claim that the State could not show all the wrongful acts he committed against Natasha. (By this observation we do not mean to imply that the evidence was not proper.) The wrongful acts that the defendant committed against Anthony were but part of the general course of conduct in which he engaged against Victoria Gibbs and Natasha at the same place and over the same. period. (*People v. Ciucci* (1956), 8 Ill. 2d 619, 137 N.E.2d 40; *Coleman v. State* (Fla. App. 1986), 485 So.2d 1342.) It is not controlling that the judge allowed the evidence on grounds other than the fact that the acts against Anthony were part of the *res gestae*. See *People v. Levy* (1989), 186 Ill. App. 3d 842, 542 N.E.2d 930.

For these reasons, we judge that the court did not abuse its discretion in permitting proof of the assault of Anthony. Gibbs. We judge further that the evidence of the wrongful acts against Rhonda and Anthony were highly probative in that they tended to prove an essential element of the crime and that the probative value of the evidence exceeded any prejudical effect it might have.

We concede, however, that we have considerable difficulty in justifying the admission of the acts committed against Atland and Evelyn Caruth. Neither *Milner*, nor any of the cases from other jurisdictions which we have cited, factually support the State's argument that proof of the acts against Atland and Evelyn Caruth establishes that the defendant intended to kill Natasha six years later. The acts against Atland and Evelyn are not so strongly similar to the acts against Natasha as were the acts against Rhonda. Most important, the acts against Rhonda caused her death and thus placed the defendant on notice that his assaults of a small child had a strong probability of causing death. It is for those reasons that we have upheld admissibility of the acts against Rhonda to show intent to kill Natasha, while refusing to hold that the acts against Atland and Evelyn established that same intent.

Similarly, we cannot accept the State's argument that

the acts against Atland and Evelyn were proof of the defendant's *modus operandi* or any of the other recognized purposes for which such evidence may be received. Evidence of a separate offense may be admissible as proof of *modus operandi* only upon a strong and persuasive showing of the similarity between the crime charged and the separate offense; there must be a substantial and meaningful link between the offenses being compared. Although the similarities of the offenses being compared need not be unique, some distinctive feature not common to most offenses of that type must be present to show *modus operandi*. (*People v. Partin* (1987), 156 Ill. App. 3d 365, 509 N.E.2d 662.) Obviously, there are similarities between the acts committed against Evelyn and Atland and those committed against Natasha in that they were all acts of senseless cruelty to children. But we do not believe that the similarities are sufficient to meet the requirements of the *modus operandi* exception. That lack of sufficient similarity and the six-year lapse of time between the acts lead us to conclude that the evidence should not have been received. It is apparent that all the evidence shows that the defendant has a propensity to abuse children, to say the least, but unless there is some other relevant purpose for the introduction of such evidence, it must be excluded.

■■■ However, we judge that the reception of the evidence in a bench trial was not so prejudicial that the defendant's conviction should be reversed. (See *People v. Kline* (1982), 92 Ill. 2d 490, 504, 442 N.E.2d 154, 161.) Our direction comes from the supreme court, which instructs us:

> "It is not the policy of this court to reverse a judgment of conviction merely because error was committed unless it appears that real justice has been denied or that the finding of guilty may have resulted from such error. [Citations.]" *People v. Morehead* (1970), 45 Ill. 2d 326, 332, 259 N.E.2d 8, 11-12.

■■■ There is no doubt that the defendant did the acts that led Natasha to an almost vegetative state; there is no doubt that he killed Rhonda; and there is no doubt that he repeatedly beat a 2½-year-old boy. In short, the admissible evidence supports the judge's conclusion that the defendant was a "torturer and abuser of children." We cannot believe that the judge would have acquitted the defendant if the evidence of the beatings of Atland and Evelyn Caruth had been excluded; nor can we believe that he would not have imposed an extended term.

The wrongful acts that the defendant committed against Natasha alone justified the imposition of an extended term (Ill. Rev. Stat.

1983, ch. 38, pars. 1005—5—3.2(b)(2), (b)(3)(i)); and the evidence of the wrongful acts he committed against all the children would have been properly admitted in aggravation. Consequently, we are convinced that the judge would have imposed the same sentence even if the evidence of the beatings of Atland and Evelyn had not been presented during the trial.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.