2020 IL App (1st) 151311-UC
No. 1-15-1311
Order filed April 27, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 4124 |
| | ) | |
| JERRY BROWN, | ) | Honorable |
| | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Walker concurred in the judgment.[1]

**ORDER**

¶ 1    *Held*:    On remand from the supreme court, defendant's conviction for aggravated battery of a senior citizen affirmed where the evidence established that the defendants caused great bodily harm to the victim.

¶ 2    This case returns on remand from the Illinois Supreme Court. Following simultaneous but severed bench trials, Jerry Brown and codefendant Stevie Smith were convicted of robbery and aggravated battery of a senior citizen causing great bodily harm. In separate appeals, both

_____

[1] Justice Walker replaces Justice Neville, who was appointed to the Illinois Supreme Court after this court issued its original opinion.

defendants argued that their aggravated battery convictions should be vacated under the one-act, one-crime principle because both convictions were based on the same act of a single punch by Smith. Brown alternatively argued that his conviction for aggravated battery of a senior citizen should be reduced to the lesser offense of aggravated battery on a public way because the evidence did not prove that defendants caused great bodily harm to the victim.

¶ 3       In our initial review, we found that Smith's single punch was used as the basis for the aggravated battery conviction and as the element of force for the robbery conviction, and vacated the defendants' convictions for aggravated battery of a senior citizen under the one-act, one-crime rule. *People v. Brown*, 2017 IL App (1st) 151311-U; *People v. Smith*, 2017 IL App (1st) 151312. In supervisory orders, the supreme court directed us to vacate those decisions and to reconsider in light of *People v. Coats*, 2018 IL 121926. *People v. Brown*, No. 123080; *People v. Smith*, No. 123082 (Ill. Mar. 21, 2018) (supervisory orders). In 2018, we again vacated the defendants' convictions for aggravated battery of a senior citizen under the one-act, one-crime rule. *People v. Brown*, 2018 IL App (1st) 151311-B; *People v. Smith*, 2018 IL App (1st) 151312-B. The Illinois Supreme Court allowed the State's petitions for leave to appeal in both cases and consolidated the cases for review. The supreme court rejected the defendants' challenges under the one-act, one-crime principle and reversed our decisions in both cases. *People v. Smith*, 2019 IL 123901. In addition, the supreme court remanded Brown's case to consider his alternative argument challenging the sufficiency of the evidence establishing the element of great bodily harm for the aggravated battery of a senior citizen conviction. *Id.* ¶ 41.

¶ 4       We find that the evidence established beyond a reasonable doubt that Brown caused great bodily harm to the victim and affirm his conviction. Viewed in the light most favorable to the

State, the record shows that the evidence established that Smith's punch fractured Burtner's ribs, and hence, Brown inflicted great bodily harm to Burtner.

¶ 5                              Background

¶ 6    Brown and Smith were tried on charges of first-degree murder, aggravated battery of a senior citizen, robbery, and aggravated battery. At trial, Deborah Halloran testified that she managed the bar at the Veterans of Foreign Wars post in Midlothian, where William Burtner served as the commander. At about 9:30 a.m. on November 16, 2009, Burtner and Halloran prepared money for deposit into accounts the VFW maintained at A.J. Smith Bank. Burtner drove to the bank with three deposit bags and a cigar box, all with money. Shortly after 10 a.m., a bank employee called Halloran and she went to the bank. Burtner was in the back of an ambulance, short of breath, in pain, and holding his ribs.

¶ 7    Connie Weimar, a teller at A.J. Smith Bank, testified that, at about 10:15 a.m., she looked out the window and saw Burtner walking toward the bank carrying bank deposit bags. As Burtner approached the entrance, Weimar lost sight of him. Next, Weimar saw a man wearing a hooded sweatshirt quickly walking past the front of the bank toward Burtner. Weimar could not see his face because the hood covered the man's head. The man had nothing in his hands. The man disappeared from Weimar's sight for "a matter of seconds." When next she saw him, the man held something in his hands, had turned around, and was running to the adjacent Wendy's parking lot. There, he entered the front passenger seat of a car, which drove off, headed north. Weimar yelled, "Call 911." Two bank employees brought Burtner inside the bank and sat him down in a chair. Later, the man wearing the hooded sweatshirt was determined to be Smith.

¶ 8    Tamara Esposito, a bank employee, heard her supervisor yell, "Call 911, I believe somebody was just robbed." Esposito went to the front door and saw Burtner on the ground. Esposito and a security guard helped Burtner. Esposito and the security guard brought Burtner inside. Burtner was slightly bent over and holding his left side near his rib cage. His breathing was labored, and he had difficulty speaking. Burtner told Esposito that he had been punched in his left side.

¶ 9    Esposito narrated three video clips from the bank's surveillance cameras. The first video showed Burtner approaching the bank's front entrance. One frame depicted a second person near Burtner. Both then left the camera's view. Esposito and the security guard are seen rushing out of the bank. Moments later, Esposito assists Burtner as he enters the bank holding his left side. The second video depicted Esposito assisting Burtner to a chair inside the bank. The third video showed Burtner getting out of his car and walking towards the bank. A person wearing a black hooded sweatshirt appears near Burtner. Esposito was again shown assisting Burtner inside the bank.

¶ 10    Paramedics treated Burtner at the bank. Burtner was holding his left side in his back rib area. Burtner complained of pain in that area and also experienced pain when taking deep breaths. The State presented a stipulation that Burtner told a paramedic that "he was hit from behind, and he fell." The paramedics' written report indicated Burtner did not have any injuries.

¶ 11    Meanwhile, a high-speed police chase of the car driven by Brown had ensued. Brown and Smith crashed into another car and came to a stop. They ran in opposite directions. Minutes later, police found Brown hiding underneath a car in a backyard and placed him in custody. During a custodial search, police recovered cash from his right pocket. In the car, police found the A.J.

Smith bank deposit bags and money. The Illinois State Police crime laboratory tested blood samples taken from the passenger's side. The results indicated a DNA match with Smith.

¶ 12     Ruben Pesina, a friend of Burtner's and retired army nurse, received a call from Halloran and went to the emergency room. Burtner was in bed in a semi-crouched position, grimacing in pain, and holding his left side. Due to the pain, Burtner couldn't undress himself. As Pesina assisted Burtner with removing his shirt, Pesina saw a "pinkish-type blemish" on Burtner's left lateral back.

¶ 13     On cross-examination, Pesina testified that Burtner also complained of knee pain. Pesina acknowledged that a chest sprain can cause severe pain. A chest sprain is discomfort associated with cartilage and the ribs, and could occur on the left side. A person with a left chest sprain would be expected to favor his left side. Burtner had pain in the left side of his chest and held his right hand in the front area of his left side. Pesina did not know at that time whether Burtner had a fracture or a sprain. He acknowledged that one way to determine a chest sprain or fractured rib is to take x-rays from multiple angles.

¶ 14     On redirect examination, Pesina confirmed that fractured ribs are not always visible on x-rays. Whether a person has fractured ribs is often determined by the symptoms, such as pain and labored breathing. Generally, treatment for fractured ribs and a chest sprain involves pain medication and allowing the patient to heal, possibly with a wrap.

¶ 15     On re-cross examination, Pesina acknowledged that Burtner was missing half of his right lung and undergoing chemotherapy for lung cancer. For those reasons, Burtner could have been experiencing labored breathing. Ultimately, the best way to tell if someone has fractured ribs is

to look inside the body. On further redirect, Pesina confirmed that fractured ribs occur from some type of blunt force trauma.

¶ 16    Mary Burtner, William's wife, testified that while in the emergency room, her husband was in extreme pain and holding his left side. He also had injured his knee. Burtner was treated and released from the hospital on the day of the robbery. When Burtner returned home, he was in a lot of pain, "very, very uncomfortable," and favoring his left side. The next day, he felt worse. The following morning, November 18, although still in a lot of pain, Burtner went to his chemotherapy appointment. He had been battling lung cancer for three years. At the hospital, Burtner was unable to walk due to his pain and needed a wheelchair. When the couple arrived home at about 3 p.m., Burtner was still holding his left side and was unable to get out of the car. Mary assisted him into their home and to bed. Because of the pain in his left side, Burtner was unable to undress himself. Burtner fell asleep, and Mary checked on him frequently. At about 8:30 p.m., she found her husband unresponsive and called 911.

¶ 17    When paramedic Michael Galvan arrived, Burtner was unresponsive, not breathing, had no pulse or blood pressure, and was flat-lined. His skin was blue and cool. His eyes were dilated, indicating that Burtner had been without oxygen for a prolonged time. Paramedics performed CPR, administered cardiac medications, and transferred Burtner to the hospital. There were no signs of life.

¶ 18    On cross-examination, Galvan testified that Burtner received chest compressions for about 20 minutes in an attempt to restore his blood flow. If any veins or arteries in Burtner's chest were cut, blood could flow into his chest cavity. Galvan was not aware that Burtner had broken ribs. He did not notice any bruising on Burtner's chest wall, sides, or back.

¶ 19    On redirect examination, Galvan acknowledged that he has broken bones in the center of the chest while giving CPR. He never witnessed rib fractures on the side of a body as the result of CPR. Throughout Burtner's treatment, nothing indicated blood flow.

¶ 20    The State presented Burtner's death certificate indicating that he was 65 years old.

¶ 21    An assistant chief medical examiner, Dr. Ponni Arunkumar, performed the autopsy. Before her internal exam, Dr. Arunkumar took an x-ray of Burtner's chest which did not reveal any fractured ribs. Burtner had external bruises on both knees. There were no external bruises on his left chest. Dr. Arunkumar's internal exam revealed that Burtner suffered from lung cancer, had two heart attacks, and heart disease. She found three fractured ribs on the left side of Burtner's chest wall. The rib fractures had occurred less than three or four days earlier and were consistent with having been punched. There was no evidence of healing. A hemorrhage in the chest wall was mostly red, which can be a bruise or contusion to the tissue, not merely blood leaking into the cavity. The hemorrhage she observed was not the result of the CPR conducted on him because he had no blood pressure or blood flow at that time. CPR compressions try to stimulate the heart; they do not perform the functions of a heart such as pumping blood. In other cases, where Dr. Arunkumar observed ribs that were fractured during CPR, those fractures occurred on the front left chest where the compressions were applied. Dr. Arunkumar concluded that Burtner's cause of death was hypertensive cardiovascular disease. The fractured ribs, which were due to an assault, constituted a significant contributing factor of Burtner suffering a heart attack. In her opinion, Burtner's manner of death was homicide.

¶ 22    On cross-examination, Dr. Arunkumar testified that she did not have difficulty establishing the age of Burtner's fractures because what she observed during the autopsy was

consistent with Burtner being assaulted on November 16. She did not think that the fractures could have occurred on the morning of November 18 because there was some discoloration which indicated "there was some significant time difference between the death and the fractured ribs." She did not recall viewing the x-rays taken on the day of the assault. Burtner suffered anterolateral rib fractures that may not be seen on an x-ray. She acknowledged that by simply looking at the fractures and hemorrhage, without any other information, she would not be able to tell if they occurred due to an assault or fall.

¶ 23    Dr. Lee Christensen, a radiologist with Metro South Medical Center, testified for the defense. On November 16, he reviewed x-rays of Burtner's ribs taken in the emergency room on both sides of his chest. While viewing x-rays taken from multiple angles, he did not see rib fractures or complications from a fracture such as fluid or air around the outside of the lung, or a contusion or bruise of the lung tissue. A report from the emergency room also indicated that the x-rays did not reveal rib fractures. Dr. Christensen acknowledged that x-rays are not foolproof, and that bone scans or MRIs are sometimes recommended, but he did not do so.

¶ 24    On cross-examination, Dr. Christensen confirmed that even if an x-ray shows no complications, it is still possible that a rib is fractured. Further, the best way to determine if a person has a fracture is to go inside the body and look at the rib.

¶ 25    The trial court found that the State failed to prove that defendants caused Burtner's death and concluded that defendants were not guilty of first-degree murder. The trial court, however, found that the State proved that defendants "certainly" inflicted great bodily harm on Burtner and pronounced them guilty of aggravated battery of a senior citizen. The court also found defendants guilty of robbery and aggravated battery. The aggravated battery counts were merged

into the aggravated battery of a senior citizen offense. As Burtner was over the age of 60, the trial court elevated the robbery offense from Class 2 to a Class 1 felony.

¶ 26    The trial court sentenced Brown to 15 years' imprisonment for robbery and a consecutive term of 7 years' imprisonment for aggravated battery of a senior citizen.

¶ 27                                    Analysis

¶ 28    In his remaining argument on appeal, Brown contends that his conviction for aggravated battery of a senior citizen should be reduced to aggravated battery on a public way because the evidence did not prove that the defendants caused great bodily harm to Burtner. Brown argues that the evidence showed that Smith inflicted a single punch, Burtner fell to the ground, and his knees were bruised. He asserts that bruised knees and pain from the punch did not amount to great bodily harm. Brown claims that the State failed to prove that Smith's punch fractured Burtner's ribs. He points out that the radiologist did not observe fractured ribs on the x-rays, and Burtner was released from the hospital the same day without receiving any notable medical treatment. He argues that the medical examiner did not observe external bruises on Burtner's left side and could not determine when the fractures occurred.

¶ 29    Brown suggests the fractures could have occurred during CPR. In addition, Brown claims the trial court acquitted him and Smith of murder because there was no connection between Smith's punch and Burtner's fractured ribs.

¶ 30    The State responds that the evidence overwhelmingly proved that Smith's punch fractured Burtner's ribs, and broken bones constitute great bodily harm. The State argues that testimony from multiple witnesses established that, immediately after being punched, Burtner was holding his left side, in extreme pain, and short of breath. The surveillance video also

showed Burtner holding his left side. In addition, the medical examiner determined that the three broken ribs and the corresponding hemorrhage were consistent with being punched at the same time as the robbery a few days earlier. The State points out that the radiologist and medical examiner agreed that rib fractures are not always visible on x-rays.

¶ 31    The State further argues that the evidence showed that Burtner's ribs were not fractured during the CPR because CPR fractures occur on the front of the chest, not the side, and the hemorrhaging could not have occurred after his death. The State notes that the trial court acquitted the defendants of murder because it found that their actions did not cause Burtner's heart attack or death; however, it "certainly" found that they inflicted great bodily harm.

¶ 32    When a defendant claims that the evidence is insufficient to sustain his or her conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial, and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). All reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 33    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the fact finder need not disregard the inferences that naturally flow from that evidence, nor search

for a possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse a criminal conviction based on insufficient evidence because defendant claims that a witness was not credible or that the evidence was contradictory. *Siguenza-Brito*, 235 Ill. 2d at 228. We will reverse a criminal conviction based on insufficient evidence should the evidence be so improbable or unsatisfactory that reasonable doubt exists as to defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 34 To prove Brown guilty of aggravated battery of a senior citizen as charged, the State was required to show that, without legal justification and by any means, defendants intentionally and knowingly caused great bodily harm to Burtner, a person 60 years old or older, by striking him about the body, causing injuries. 720 ILCS 5/12-4.6(a) (West 2008).

¶ 35 Whether an injury constitutes great bodily harm presents a question of fact for the trier of fact. *People v. Crespo*, 203 Ill. 2d 335, 344 (2001). "Bodily harm" means physical pain or damage to the body, such as lacerations, bruises or abrasions, whether temporary or permanent. *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 63. "Great bodily harm," which does not lend itself to a precise legal definition, requires proof of an injury greater and more serious in nature than a simple battery. *People v. Thigpen*, 2017 IL App (1st) 153151, ¶ 29.

¶ 36 The question is not what the victim did or did not do to treat his or her injuries, but what injuries the victim received. *Id*. This court has found that three fractured ribs constituted great bodily harm. See *People v. Caliendo*, 84 Ill. App. 3d 987, 993 (1980) ("no doubt" that defendant knowingly and intentionally caused great bodily harm to t victim when he struck him with hammer and metal bar causing "three fractured ribs and lacerations and contusions of the hands

and legs"); *People v. Brown*, 199 Ill. App. 3d 860, 874 (1990) ("A broken collar bone is 'great bodily harm.'").

¶ 37    Viewed in the light most favorable to the State, the record shows that the evidence established that Smith's punch fractured Burtner's ribs, and hence, defendants inflicted great bodily harm to Burtner. Testimony from multiple witnesses established that immediately after being punched, Burtner complained of extreme pain on his left side, was holding his left side near his rib cage, and was short of breath. Video from the bank's surveillance camera showed Burtner holding his left side as Esposito assisted him to enter the bank and sit in a chair. At the hospital, Burtner laid in the bed in a semi-crouched position, grimacing in pain and still holding his left side. Pesina observed a "pinkish-type blemish" on Burtner's left lateral back. Burtner's wife testified that when they returned home, he was in a lot of pain, "very, very uncomfortable," and favoring his left side. The next day, he felt worse. Due to the extreme pain on his left side, Burtner was unable to walk, get out of the car, or undress himself. He died that night.

¶ 38    During the autopsy, Dr. Arunkumar discovered that Burtner had three fractured ribs on the left side of his chest wall, the area where he had been punched. Dr. Arunkumar determined that the fractures had occurred less than three or four days earlier and conformed with being punched. The doctor's testimony established that the age of the fractures coincided with the date of the assault, which occurred three days earlier. The trial court concluded that the evidence proved beyond a reasonable doubt that Smith's punch fractured Burtner's ribs, and thus, defendants had "certainly" inflicted great bodily harm to Burtner. Based on this record, we find no reason to disturb the trial court's finding.

¶ 39    We find no merit in Brown's argument that the radiologist, Dr. Christensen, did not observe fractured ribs on the x-rays taken in the emergency room. Dr. Christensen, Dr. Arunkumar, and Pesina, a former nurse, all testified that fractured ribs are not always visible on x-rays. The record shows that Dr. Arunkumar also took an x-ray of Burtner's chest just before her internal examination, and that x-ray did not reveal fractured ribs. Her internal exam, however, revealed that Burtner had three fractured ribs. So the record confirms that the inability to view the fractured ribs on the x-ray was of no import.

¶ 40    We reject Brown's suggestion that Burtner's ribs were fractured by the paramedics who administered CPR. Galvan testified that when paramedics arrived and began CPR, Burtner was already unresponsive, not breathing, had no pulse or blood pressure, and was flat-lined. His skin was blue and cool, and his eyes were dilated, indicating that he had been without oxygen for a prolonged time. There was no blood flow and no signs of life. Dr. Arunkumar explained that the hemorrhage or bruise inside Burtner's chest wall could not have been caused by CPR because he had no blood flow when the CPR was administered.

¶ 41    Dr. Arunkumar further testified that the fractures could not have occurred on November 18, the day Burtner died. CPR was administered because the discoloration inside Burtner's chest wall indicated "there was some significant time difference between the death and the fractured ribs." Both Galvan and Dr. Arunkumar testified that when ribs are fractured during CPR, those fractures occur in the center of the chest where the compressions are applied, not on the side of the body where Burtner's fractures were located. The evidence contradicted Brown's suggestion that Burtner's ribs were fractured during CPR.

¶ 42     Finally, Brown's claim that the trial court acquitted him and Smith of murder because it found no connection between Smith's punch and Burtner's fractured ribs in inaccurate. The court expressly found that the defendants "certainly" inflicted great bodily harm on Burtner. That harm could only have been caused by Smith's punch. The court acquitted defendants of murder because it found that the State failed to prove that defendants caused Burtner's death. Burtner's cause of death was a heart attack. Burtner had two heart attacks before, heart disease, and lung cancer. Thus, the court determined that, in light of Burtner's medical history and condition, it could not find beyond a reasonable doubt that Smith's punch caused the fatal heart attack.

¶ 43     Based on this record, we conclude that the evidence was sufficient for the trial court to find that Brown inflicted great bodily harm upon Burtner.

¶ 44     Affirmed.