STATE of Utah, Plaintiff and Appellee,

v.

**Jerri TEUSCHER, Defendant and Appellant.**

**No. 930303–CA.**

Court of Appeals of Utah.

Oct. 20, 1994.

**924**

Robert K. Heineman (argued), Joan C. Watt, Salt Lake Legal Defender Ass'n, Salt Lake City, for appellant.

Jan Graham, Atty. Gen., J. Frederic Voros, Jr. (argued), Asst. Atty. Gen., Salt Lake City, for appellee.

Before BENCH, DAVIS and GREENWOOD, JJ.

BENCH, Judge:

Defendant appeals from a jury conviction of manslaughter, a second degree felony, in violation of Utah Code Ann. § 76-5-205 (1990). We affirm.

## FACTS

On December 16, 1991, defendant telephoned 911 and reported that one of the children in her home day care facility was not breathing. When emergency personnel arrived at defendant's home, they found two-month-old Richard Oscar Christensen lying on the kitchen floor. Emergency personnel noted that Richard had no pulse, no respirations, and that his skin was a little pale with cyanosis and slightly cold to the touch.[1] Richard's pupils were not reactive and he exhibited delayed capillary refill.

Emergency personnel attempted to revive Richard by mouth-to-mouth resuscitation and chest compressions at defendant's home and in the ambulance on the way to the hospital. Richard was admitted to Primary Children's Hospital. About an hour after being admitted to the hospital, Richard's heartbeat was restored. He had no spontaneous breathing, however, and his color was very poor, he was flaccid, his reflexes were negligible, and his pupils were not reactive to light. Richard never regained the ability to sustain life on his own, and the day after he was admitted to the hospital he was pronounced dead.

On the day of Richard's death, detective Jill Candland of the Salt Lake City Police Department telephoned defendant and asked her and her two teenage daughters, who were present in the home when emergency personnel arrived, to come to the police station to give statements. Defendant and her two daughters went to the police station that evening and gave statements. Because the police had not yet determined whether any criminal conduct had occurred, none of the interviewees was advised of their Miranda rights. *See Miranda v. Arizona,* 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Defendant stated that she did not know what had happened to Richard, but claimed that when she checked on him he was moving around and that thirty seconds later, after picking him up, he went limp.

On January 3, 1992, detective Candland contacted defendant again and asked her to come to the police station for another interview. Defendant was interviewed twice on the evening of January 3. Before making any statements, defendant was advised of her Miranda rights. Detective Candland testified at trial that on January 3, defendant initially indicated she did not know what had happened to Richard. Later that evening, defendant changed her statement and indicated that Richard had hit his head on the arm of a rocking chair. When detective Candland told defendant that such an incident was inconsistent with Richard's injuries, defendant changed her statement again and indicated that she accidently dropped him in a playpen. Detective Candland testified that she believed defendant's explanation could account for Richard's injuries and that at that time the police lacked "reasonable cause to believe that a crime had been committed and the defendant had committed that crime." Detective Candland arranged for defendant to return to the police station on January 6 in order to videotape defendant demonstrating how she dropped Richard.

---

1. Cyanosis is defined as "a dusky bluish or purplish discoloration of skin or mucous membranes due to deficient oxygenation of the blood...." *Webster's Third New International Dictionary* 563 (1986).

When defendant returned to the police station to be videotaped on January 6, she was not advised of her Miranda rights. Defendant was videotaped demonstrating how she dropped Richard as she had explained on January 3.

Defendant was arrested on March 6, 1992, and charged with second degree murder, a first degree felony, in violation of Utah Code Ann. § 76–5–203 (Supp.1991). The State filed a motion in limine to allow it to introduce evidence of prior bad acts committed by defendant against children in her day care. The trial court granted the State's motion in part and allowed the State to introduce limited evidence concerning defendant's prior bad acts. The following summarized testimony was admitted at trial:

(1) Testimony from David and Heather Marston that on November 19, 1990, their six-month-old son Austin suffered a broken leg while in defendant's care. Mrs. Marston testified that Austin was screaming when she picked him up from defendant's home and defendant stated that "he must be hungry. He just got up from his nap." Both Mr. and Mrs. Marston testified that when Austin continued to cry and could not straighten his leg, they took him to a hospital where it was determined that his leg was broken. Mrs. Marston testified that defendant initially told her that nothing had happened to Austin but later indicated that she remembered him rolling off of the couch.

(2) Testimony from detective Charles Trost from the Salt Lake City Police Department that he interviewed defendant and that she had stated "to her knowledge that there wasn't an injury to [Austin], that she had done nothing to have caused an injury, that she knew of no reason why the child would be considered injured in her house." Detective Trost also testified that defendant told him she had placed Austin on a couch but that he had not fallen off. Detective Trost further testified that defendant called him the night before a subsequently scheduled police interview and stated her daughter had dropped Austin. Finally, detective Trost testified that during the police interview on the following day, defendant stated that she, not her daughter, had dropped Austin after changing his diaper and that she thought he "hadn't hit that hard on the floor."

(3) Defendant's daughter testified that defendant had told her that Austin had broken his leg when he fell down some stairs.

(4) Defendant's neighbor, Bently Wilson, testified that in the summer of 1991 he observed defendant pick up a three- to four-year-old boy and shake him "harshly" and "vigorously" for "five to ten seconds" while his head "went back and forth."

(5) Defendant's neighbor, Brenda Wilson, testified that in the summer of 1991 she saw defendant call a crying four-year-old to her in her back yard and when he was within reach of defendant "she reached out and grabbed his hair with her fist and yanked his head over so that it was closer to where she was standing...." She further testified that defendant "proceeded to lift him up and over the railing by one arm into the house."

(6) Various witnesses testified to seeing children in closets in defendant's home. One witness testified that upon investigating noise coming from a closet she opened the closet door and found two children in the closet. Another witness testified that he had seen six or seven children crowded into a dark basement closet.

The trial court ruled that evidence regarding Austin Marston's broken leg, testimony from defendant's daughter concerning the manner in which Austin's leg was broken, and testimony from Mr. and Mrs. Wilson concerning other incidents of abuse against other children were admissible under Rule 404(b) of the Utah Rules of Evidence to show the identity of the perpetrator, the intent or mental state of the perpetrator, and the absence of accident or mistake. The trial court further ruled that evidence of children being locked in closets was admissible under Rule 404(b) to show the intent or mental state of the perpetrator.

At trial, the State also introduced evidence from several medical experts who concluded that Richard's death was due to injuries sustained by unnatural force applied to his spinal column such that it was stretched, twist-

ed, flexed, or extended. The State's medical experts agreed that Richard's pattern of injuries were consistent with being held by the head and violently shaken.

The jury was instructed on second degree murder and the lesser-included offenses of manslaughter and negligent homicide. The jury convicted defendant of manslaughter and this appeal followed.

## ANALYSIS

### Rule 404(b)

■ Defendant argues that the trial court erred by admitting evidence of her prior acts of child abuse under Rule 404(b) of the Utah Rules of Evidence. Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Utah R.Evid. 404(b). "[E]vidence of other offenses may be received, if relevant, for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime...." *United States v. Woods*, 484 F.2d 127, 134 (4th Cir.1973), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974);[2] *see also* Ronald N. Boyce & Edward L. Kimball, *Utah Rules of Evidence 1983*, 1985 Utah L.Rev. 63, 85–86 ("Utah case law and both the old and new Utah Rules have taken the position that evidence of other crimes or wrongs is admissible unless its relevancy is *only* to show the disposition of a person."). A trial court has broad discretion in admitting prior bad-act evidence under Rule 404(b). *See United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir.1992); *accord United States v. Dobynes*, 905 F.2d 1192, 1195 (8th Cir.), *cert. denied*, 498 U.S. 877, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990). "Improperly admitted evidence re-

quires reversal of a conviction only where we conclude there is a 'reasonable likelihood that the error affected the outcome of the proceedings.'" *State v. O'Neil*, 848 P.2d 694, 699 (Utah App.) (quoting *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992)), *cert. denied*, 859 P.2d 585 (Utah 1993).

■ Defendant argues that the identity of the perpetrator, the intent or mental state of the perpetrator, and lack of accident or mistake were not at issue in this case and that the trial court therefore erred by admitting evidence under Rule 404(b). However, the manner in which defendant presented her defense placed all three issues in question.

■■ Defendant denied being the perpetrator of Richard's injuries both in her opening statement and throughout trial. She raised identity as an issue when she argued, in opposition to the State's motion in limine, that she had two teenage daughters in the home who could have caused Richard's injuries. In her closing argument, defendant further stated that someone else in the home may have caused Richard's injuries. Moreover, while defendant argued that she did not cause Richard's injuries, she argued in the alternative, that his injuries might have been caused when she accidently dropped him in a playpen. By maintaining an accident defense, defendant also placed intent in issue. *See, e.g., People v. Brown*, 199 Ill.App.3d 860, 145 Ill.Dec. 841, 851, 557 N.E.2d 611, 621 ("Evidence which shows that an event was not caused by accident tends to show that the event was caused intentionally."), *appeal denied*, 133 Ill.2d 561, 149 Ill.Dec. 326, 561 N.E.2d 696 (1990). Defendant argues that intent was not an element of the crime for which she was convicted—manslaughter. Defendant was charged, however, with second degree murder, a specific intent crime. *See State v. Standiford*, 769 P.2d 254, 260 n. 3 (Utah 1988). "Where specific intent is an element of the crime, the prosecution may introduce evidence of other offenses to establish the element of intent even if the defendant has not placed intent into question."

2. Because Utah's Rule 403 and Rule 404(b) are identical to their federal counterparts, "federal interpretations of the rule[s] are persuasive." *State v. Smith*, 817 P.2d 828, 829 (Utah App. 1991); *accord Olson v. Salt Lake City Sch. Dist.*, 724 P.2d 960, 965 n. 5 (Utah 1986); *Salt Lake City v. Holtman*, 806 P.2d 235, 237 n. 2 (Utah App.1991):

*Brown,* 557 N.E.2d at 621 (citing *United States v. Brantley,* 786 F.2d 1322 (7th Cir. 1986)); *accord State v. Smith,* 61 N.C.App. 52, 300 S.E.2d 403, 407 (1983). In pleading not guilty, defendant put every element of the charge against her in issue. *State v. Foster,* 229 Kan. 362, 623 P.2d 1360, 1363 (1981); *accord Brown,* 557 N.E.2d at 621.

■ Evidence regarding prior instances of abuse perpetrated against the victim is clearly admissible in Utah to show identity, intent or mental state, and lack of accident or mistake. *See, e.g., State v. Allen,* 839 P.2d 291, 297 (Utah 1992); *State v. Tanner,* 675 P.2d 539, 543–48 (Utah 1983); *State v. Morgan,* 865 P.2d 1377, 1380 (Utah App.1993). The admissibility of evidence of prior instances of abuse perpetrated against children other than the victim, however, is a question of first impression in Utah.

Other jurisdictions have generally held that evidence of acts of child abuse perpetrated against children other than the victim of the crime for which defendant is accused is admissible. In *Woods,* the defendant was convicted of murder in the first degree and seven charges of assault with intent to murder, attempt to murder, and mistreatment of her eight-month-old preadoptive foster son who died from lack of oxygen. 484 F.2d at 128–29. At trial, the government presented evidence that nine children under defendant's care suffered a minimum of twenty episodes of cyanosis. Seven of the children under defendant's care died. The court allowed the government to introduce evidence of the prior cyanotic episodes and deaths to show the identity of the perpetrator and lack of accident or mistake. The Fourth Circuit Court of Appeals concluded that evidence concerning acts of abuse against children other than the victim was properly admitted. *Id.* at 134–35.

Similarly, in *Foster,* evidence of prior acts of child abuse against a child other than the victim was admitted to show the identity of the perpetrator. 623 P.2d at 1364. The defendant was charged with premeditated murder of a six-month-old boy. The defendant denied any act of violence toward the victim. In the twenty-four-hour period before the defendant took the child to the hospital with fatal injuries, both the defendant and the child's mother had at various times cared for the child. Since either one could have caused the injuries, the identity of the perpetrator was in issue. The trial court allowed the admission of evidence of the defendant's prior conviction for endangering a child. The conviction involved a seven-month-old child who suffered injuries similar to the present victim. While that child survived, it was severely brain damaged. The Kansas Supreme Court ruled that the trial court did not abuse its discretion by admitting evidence of the defendant's prior act of child abuse against a child other than the victim for the purpose of showing, among other things, the identity of the perpetrator. *Id.; see also Longfellow v. State,* 803 P.2d 848, 853–54 (Wyo.1990) (evidence of prior child abuse of another child admitted to show identity).

In *Brown,* evidence of prior acts of child abuse against a child other than the victim was admitted to show the defendant's intent or lack of accident or mistake. 557 N.E.2d at 621. The defendant was convicted of attempted murder, aggravated battery, and aggravated battery of a child. The victim in *Brown,* a nineteen-month-old girl, had been severely abused by the defendant over time. As a result of being thrown into the ceiling by the defendant, she sustained severe spinal injuries that left her permanently paralyzed from the neck down and unable to breathe on her own. The trial court allowed the admission of evidence of the defendant's rather lengthy history of prior acts of child abuse episodes against other children, including a previous conviction for involuntary manslaughter of another nineteen-month-old girl who sustained injuries similar to the victim in the present case, but died as a result of the injuries. On appeal, the defendant argued that the trial court erroneously admitted evidence of prior abuse against other children to show intent or lack of accident or mistake. The appellate court held that the evidence of prior acts of child abuse, including the previous conviction for involuntary manslaughter, "was admissible to show the defendant's intent or, put another way, the absence of

accident when he nearly caused the death of the [present victim]." *Id.*

Similarly, in *State v. Riggsbee*, 72 N.C.App. 167, 323 S.E.2d 502 (1984), defendant was convicted of felonious abuse of a child in a day-care facility she operated out of her home. The trial court allowed the State to introduce evidence that defendant had previously abused a seven-month-old child also in her care. The appellate court upheld the admissibility of the evidence of prior abuse against another child on the ground that it tended to show that "the injuries complained of were the result of an intentional act and not of an accidental fall." *Id.* 323 S.E.2d at 506; *see also State v. Morosin*, 200 Neb. 62, 262 N.W.2d 194, 196–97 (1978) (acts of prior child abuse against child other than victim admitted to show intent); *State v. Smith*, 61 N.C.App. 52, 300 S.E.2d 403, 407 (1983) (same).

In the present case, defendant argued she was not responsible for Richard's injuries. She further argued that two of her daughters, both teenagers at the time, were in the home when Richard was injured and either one of them could have been responsible for his injuries. She also argued that Richard's injuries might have resulted when she accidently dropped him into a playpen. Because of the manner in which defendant presented her defense to the crimes charged, identity and intent or lack of accident or mistake were all placed in issue. In light of the authorities discussed above, we are persuaded the trial court did not abuse its discretion in admitting evidence of acts of child abuse committed by defendant against children other than the victim in the present case.

### Rule 403

■ Defendant argues that even if the evidence was admissible under Rule 404(b), it should have been excluded under Rule 403 of the Utah Rules of Evidence. Even if prior bad-act evidence is relevant and admissible under Rule 404(b), it may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice." Utah R.Evid. 403. As explained in *State v. Larsen*, 876 P.2d 391 (Utah App. 1994):

A trial court's rule 403 determination will not be disturbed absent an abuse of discretion. *State v. Pena*, 869 P.2d 932, 938 (Utah 1994); *State v. Ramirez*, 817 P.2d 774, 781–82 n. 3 (Utah 1991). We review the trial court's ruling admitting evidence by deciding whether the trial court's decision was beyond the bounds of reasonableness. *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992).

*Id.* at 395; *accord State v. Bartley*, 784 P.2d 1231, 1237 (Utah App.1989). "Evidence is unfairly prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause the jury to base its decision on something other than the established propositions in the case.'" *Bartley*, 784 P.2d at 1237 (quoting *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989)). "The balancing test of rule 403 thus excludes 'matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Id.* (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

In the present case, the State introduced evidence that Richard's injuries were caused by a severe shaking while being held by his head. Because of the defense asserted, the State was required to show the identity and intent of the perpetrator, and that the injuries were not the result of an accident or mistake. The evidence objected to was therefore clearly probative. Although admission of evidence of defendant's prior acts of child abuse may have created some danger of prejudice by linking defendant to the crime, its probative value was not substantially outweighed by such danger. We conclude that the trial court did not abuse its discretion in refusing to exclude the evidence.

### Suppression of Evidence

■ Defendant argues that the trial court erred by not suppressing statements given by her to the police without being advised of her Miranda rights. On December 17, the day Richard died, defendant voluntarily went to the police station to give a statement. Without being advised of her Miranda rights, defendant told the police that she did not

know what had happened to Richard. She stated that when she checked on him he was moving around and that thirty seconds later, after she picked him up, he went limp. Detective Candland testified that at this time the police did not consider defendant a suspect in Richard's death. On January 3, defendant again voluntarily went to the police station where she was interviewed. Before each of her two interviews on January 3, defendant was advised of her Miranda rights. During one of those interviews, defendant indicated that she accidently dropped Richard while placing him in a playpen. Detective Candland believed that this was a plausible explanation for Richard's injuries and requested that defendant return on January 6 so that the police could videotape defendant demonstrating how she accidently dropped Richard. When the defendant returned on January 6, the police taped the interview without reapprising defendant of her Miranda rights. Defendant argues that the trial court erred by not suppressing the contents of the December 17 and January 6 interviews because she was not advised of her Miranda rights on those occasions. We disagree.

■ In *State v. Wood,* 868 P.2d 70 (Utah 1993), the supreme court stated:

> The Fifth Amendment to the United States Constitution guarantees that a defendant shall not be "compelled in any criminal case to be a witness against himself." To secure this fundamental right, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established procedural safeguards to be followed in a custodial interrogation. The prescribed procedures require a warning that the defendant has the right to remain silent and the right to have an attorney present during questioning. *Id.* at 444, 86 S.Ct. at 1612. The defendant may waive these rights, but the waiver must be voluntary, knowing, and intelligent. *Id.* ... The prosecution may not use as evidence a defendant's statements obtained in violation of these safeguards. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

*Id.* at 81. Generally, four factors must be considered to determine whether an "accused who has not been formally arrested is 'in custody' for *Miranda* purposes: '(1) the site of the interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of the interrogation.'" *Id.* at 82 (quoting *Salt Lake City v. Carner,* 664 P.2d 1168, 1171 (Utah 1983)); *accord State v. Bishop,* 753 P.2d 439, 465 n. 77 (Utah 1988); *State v. Kelly,* 718 P.2d 385, 391 (Utah 1986). "The absence of 'coercive or compulsive strategy on the officer's part' evidences a noncustodial interrogation that 'does not suggest the type of abuse *Miranda* is intended to prevent.'" *Wood,* 868 P.2d at 82 (quoting *Kelly,* 718 P.2d at 391).

■ While the appellate courts have determined the legal standards applicable to custody determinations in *Wood* and *Carner,* the trial court has some discretion to apply those legal standards to unique fact situations. *See State v. Pena,* 869 P.2d 932, 936–38 (Utah 1994); *see, also, Estate of Clay T. Beesley,* No. 930458, slip op. at 6, —— P.2d ——, —— (Utah Oct. 14, 1994) (trial court given considerable discretion where articulated legal standard is applied to highly variable fact patterns). Stated in terms used by the *Pena* court, we grant some degree of discretion to the trial court to determine ultimate fact where "the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out...." *Pena,* 869 P.2d at 939 (citing Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635, 662–63 (1971)); *accord State v. Barnhart,* 850 P.2d 473, 475–77 (Utah App. 1993). Because the determination of custody for Miranda purposes is fact sensitive, we accord a measure of discretion to the trial court's determination unless such determination exceeds established legal boundaries. Additionally, as a preliminary matter, defendant

> must marshal all evidence in favor of the facts as found by the trial court and then demonstrate that even viewing the evidence in a light most favorable to the court below, the evidence is insufficient to support the findings of fact. If the appellant

fails to marshal the evidence, the appellate court assumes that the record supports the findings of the trial court and proceeds to a review of the accuracy of the lower court's conclusions of law and the application of that law in the case. *Grayson Roper Ltd. v. Finlinson,* 782 P.2d 467, 470 (Utah 1989); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985). *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991).

As to the first factor (the site of the interrogation), the trial court found that defendant went to the police station voluntarily on both occasions and that she was not subjected to any force or coercion. *See State v. Sampson,* 808 P.2d 1100, 1105 (Utah App. 1990) (interview conducted at police station not conclusive of custody), *cert. denied,* 817 P.2d 327 (Utah 1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992). As to the second factor (whether the investigation had focused on defendant), the trial court found that at the time of the interviews, detective Candland had not yet concluded that a crime had been committed, let alone that defendant was a suspect.[3] As to the third factor (whether there were objective indicia of arrest), the trial court found that there was no evidence of formal arrest. The trial court also found that defendant was free to leave at any time during the interviews.[4] As to the fourth factor (the length and form of the interrogation), the trial court found that while the interrogations were rather lengthy, they were entirely devoid of coercion or intimidation.

■ Defendant has failed to properly marshal the evidence in favor of the trial court's findings. We therefore accept the findings as entered. Further, since the trial court did not exceed established legal boundaries, it did not err in determining that defendant was not in custody for Miranda purposes during the interviews on December 17 and January 6.[5]

## CONCLUSION

The trial court did not abuse its discretion by ruling that evidence of defendant's prior acts of child abuse was admissible under Rule 404(b) of the Utah Rules of Evidence. Additionally, the trial court did not abuse its discretion by failing to exclude evidence of defendant's prior acts of child abuse under Rule 403 of the Utah Rules of Evidence. Finally, the trial court did not exceed estab-

3. The police did not receive information that contradicted defendant's explanation of Richard's injuries until one week after the interview of January 6, and defendant was not arrested until two months after the interview.

4. In *Stansbury v. California,* — U.S. ——, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), the United States Supreme Court stated: "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there was a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " *Id.* at ——, 114 S.Ct. at 1529 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)).

5. Additionally, the January 6 interview was merely a recordation of the statements defendant made during the January 3 interviews. While Miranda warnings do not have "unlimited efficacy or perpetuity," a warning once given may have continuing effect beyond the interview in question. *United States v. Hopkins,* 433 F.2d 1041, 1045 (5th Cir.1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971); *see also Martin v. Wainwright,* 770 F.2d 918, 930–36 (11th Cir.1985) (second warning not required after seven days), *modified,* 781 F.2d 185 (11th Cir.1986); *Maguire v. United States,* 396 F.2d 327, 331 (9th Cir.1968) (second warning not required after three days), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969); *Whitmore v. Lockhart,* 834 F.Supp. 1105, 1124 (E.D.Ark.1992) (second warning not required after two days), *aff'd,* 8 F.3d 614 (8th Cir.1993). In the present case, defendant was given Miranda warnings on January 3 and she was aware that the purpose of the January 6 interview was merely to record the statements she made on January 3. Defendant provided no new information on January 6, and she was not in custody during the interview. We believe that the warning given on January 3 was sufficient to apprise defendant of her rights for purposes of both the January 3 and January 6 interviews. Even were we to require a new Miranda warning for the January 6 interview, the failure to so warn in this case would be harmless error because defendant divulged no new information on January 6. *State v. Velarde,* 734 P.2d 440, 444 (Utah 1986) ("It is well established that the admission of statements obtained in violation of *Miranda* can be harmless error.").

lished legal boundaries in determining that defendant was not in custody for Miranda purposes during the December 17 and January 6 interviews. We have reviewed defendant's additional arguments on appeal and conclude that they are without merit. *See State v. Carter*, 776 P.2d 886, 896 (Utah 1989).

Defendant's conviction is therefore affirmed.

DAVIS and GREENWOOD, JJ., concur.