2008 UT 49

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jennete KILLPACK, Defendant and Appellant.**

**No. 20060040.**

Supreme Court of Utah.

July 22, 2008.

---

Mark L. Shurtleff, Att'y Gen., Kris C. Leonard, Laura B. Dupaix, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

Michael D. Esplin, Provo, Margaret P. Lindsay, Orem, for defendant.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 Following a jury trial, Jennete Killpack ("Killpack") was convicted of child abuse homicide, a second degree felony, in violation of Utah Code section 76–5–208 (the "child abuse homicide statute"). She raises five issues on appeal:

1.  Whether the trial court properly instructed the jury regarding the meaning of acting "recklessly" as the term is used in the child abuse homicide statute;

2.  Whether the trial court properly rejected Killpack's proposed jury instructions that child abuse homicide cannot result from injuries inflicted by a parent if those injuries are caused by the parent's (a) reasonable child care choices or (b) reasonable treatment of the child's medical condition;

3. Whether the trial court properly admitted evidence of Killpack's prior bad acts under rule 404(b) of the Utah Rules of Evidence;

4. Whether the trial court committed cumulative error warranting the reversal of Killpack's conviction; and

5. Whether the trial court abused its discretion during sentencing by refusing to grant Killpack's request for probation.

¶ 2 For the reasons detailed below, we affirm Killpack's conviction and sentence. We will address each of the issues in the order listed above.

## BACKGROUND

¶ 3 Jennete Killpack appeals her conviction for child abuse homicide. She was found guilty of causing the death of her daughter, four-year-old Cassandra, by means of forced water intoxication.

## I. EVENTS SURROUNDING THE DEATH OF CASSANDRA KILLPACK

¶ 4 In July 1999, Killpack and her husband adopted 21–month–old Cassandra. Some years after the adoption, Cassandra began having behavioral problems, including refusing to eat at mealtimes, hoarding and sneaking food, and urinating at inappropriate times.

¶ 5 In an effort to curb these behaviors, the Killpacks began taking Cassandra to therapy sessions with a psychologist, Dr. Paul Jenkins, who diagnosed Cassandra with Reactive Attachment Disorder ("RAD"). Dr. Jenkins based his diagnosis on the Killpacks' reports of Cassandra's misbehavior, not on any behavior he observed during his sessions with the family.[1]

¶ 6 In November 2001, Dr. Jenkins suggested that the Killpacks take Cassandra to a psychiatrist who could prescribe medication for her. Resisting this suggestion, the Kill-

packs stopped seeing Dr. Jenkins and several months later began taking Cassandra to Cascade Therapy for intensive, nonmedicinal therapy aimed at treating her behavioral problems. According to Killpack, the therapists at Cascade confirmed Dr. Jenkins's RAD diagnosis and recommended that Killpack implement treatment ideas from a book by Nancy Thomas.[2] The book suggested that parents could cure a child's misbehavior by having the child repeat a particular misbehavior "in excess." The book did not, however, specifically suggest forcing a child to drink water as a treatment for the child's drinking-related misbehavior.

¶ 7 According to Killpack, Cassandra's misbehavior strained their relationship. Killpack responded to the strain by severely disciplining and sometimes injuring Cassandra during several incidents between July 9, 1999, and June 9, 2002. These incidents included Killpack hitting Cassandra on the head with a metal spoon, which caused her head to bleed; pushing Cassandra into the bathroom, where she slipped and hit her face on the toilet, which caused a black eye; backhanding Cassandra; choking Cassandra because she would not eat her food; forcefeeding Cassandra; biting Cassandra; forcing Cassandra to drink water to the point that she spit up and urinated uncontrollably; and forcing Cassandra to stand in a corner with her hands over her head until her body shook.

¶ 8 A final confrontation between Killpack and Cassandra occurred on June 9, 2002. Killpack testified that on that day, she forced Cassandra to drink water as punishment for "sneaking" a glass of Kool–Aid. During this punishment, Killpack forced Cassandra to drink water until she refused to drink anymore, at which point Killpack tied Cassandra's hands behind her back, leaned her head back, and forced her to drink through a lidded "sippy" cup. Killpack then untied Cassandra's arms, and when Killpack's husband arrived home, she enlisted him to hold Cassandra's arms while the two of them at-

---

**1.** Dr. Jenkins testified that Cassandra was quite pleasant during his sessions with her but noted that such behavior was typical in children with RAD.

**2.** Evidence relating to Cascade Therapy comes from the testimony of Killpack and her husband. No one from Cascade testified during the trial.

tempted to force Cassandra to drink yet more water. Though Killpack claims she forced Cassandra to drink no more than 24 ounces of water, medical experts testified that, based on the amount of water in her system at the time of death, Cassandra had been forced to drink more than five times that amount—4 quarts or 128 ounces.

¶ 9 When it became clear that Cassandra could not be forced to drink more water, Killpack and her husband made Cassandra do exercises, including running, jumping, and doing sit-ups. While running, Cassandra tripped several times and eventually fell to the floor. After the exercises, Killpack and her husband made Cassandra stand in the corner, where she vomited and told Killpack that she could not keep her legs from shaking and that her head hurt. Killpack told Cassandra to get a towel to clean up the vomit. Shortly after this, Cassandra collapsed and lost consciousness. Killpack's husband then called 911.

¶ 10 EMTs took Cassandra to the emergency room at Utah Valley Medical Center. Her symptoms included a distended stomach, low body temperature, slow and shallow breathing, low oxygen saturation level, low sodium levels, an excessive amount of fluid in her system, foaming at the mouth and nostrils, and swelling in the brain. Emergency crews treated Cassandra's symptoms in part with an intravenous saline solution and oxygen. Despite their efforts, doctors declared Cassandra brain dead early the next morning as a result of brain swelling, low blood sodium, and low brain oxygen, all of which resulted from being forced to drink an excessive amount of water.

## II. TRIAL COURT PROCEEDINGS

¶ 11 On September 17, 2002, Killpack and her husband were charged with child abuse homicide and were bound over for trial. Pursuant to rule 401(b) of the Utah Rules of Evidence, the State filed a notice of intent to introduce evidence of Killpack's previous abuse of Cassandra. The State claimed this evidence was necessary for two reasons: first, to show that Cassandra's death was the result of recklessness and not a mistake or accident, and second, to establish a specific pattern of behavior by Killpack toward Cassandra.

¶ 12 Killpack objected to the proposed evidence, but after a hearing on September 1, 2005, the trial court granted the State's motion to present the evidence at trial. In granting the motion, the trial court made the following findings of fact and conclusions of law: (1) that the evidence of prior bad acts need not fall directly "within one of the exceptions stated in" rule 404(b) because that list was illustrative and meant to be " 'inclusive' as opposed to 'exclusive' "; (2) that Killpack's actions constituted "evidence of specific instances of the defendant's treatment of Cassandra" and were relevant "to establish a specific pattern of behavior by the defendant toward one particular child"; (3) that "[t]he bad acts [were] relevant and their probative value [was] not substantially outweighed by the danger of unfair prejudice"; and (4) that "[t]he mens rea of recklessness[ ] under the child abuse homicide statute [did] not preclude the State from introducing prior bad acts to prove absence of mistake or accident."

¶ 13 During the six-week jury trial, Killpack presented a two-fold defense. First, she claimed that Cassandra died from accidental head trauma, not water intoxication. Second, she claimed that her actions were excusable because (1) they were used to discipline Cassandra as part of a reasonable treatment program to cure Cassandra's RAD, and (2) they were based on the advice she received from the book by Nancy Thomas and the therapists at Cascade.

¶ 14 Prior to jury deliberations, the trial court refused two of Killpack's proposed jury instructions. The first instructed the jury that parents do not commit child abuse when they injure a child as a result of their reasonable choices in providing the care, custody, and management of the child. The second similarly instructed the jury that parents do not commit child abuse when they injure a child as a result of their reasonable choices in treating the child's medical condition. Though rejecting the instructions proposed by Killpack, the trial court allowed the State's proposed jury instruction that acting "recklessly," as the term is used in the child

abuse homicide statute, refers to consciously disregarding a substantial and unjustifiable risk of committing child abuse by inflicting serious physical injury.

¶ 15 On October 11, 2005, after more than six hours of deliberation, the jury found Killpack guilty of child abuse homicide.[3] Before sentencing, Killpack presented evidence that the trial court should grant her probation in lieu of prison because of several mitigating circumstances, including the following: (1) she had no previous criminal history; (2) she was amenable to probation under supervision; (3) she had exceptionally good family relationships and did not pose a danger to her other children; and (4) imprisonment would be an excessive hardship on her children.

¶ 16 After hearing Killpack's evidence as to mitigating circumstances, the trial court denied her request for probation and sentenced Killpack to one-to-fifteen years in prison. The trial court noted that both the "catastrophic events of the last week of Cassandra's life" and Killpack's refusal to "acknowledge full responsibility for her actions" justified the sentence.

¶ 17 Killpack timely appealed her conviction and sentence to this court. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (2008).

## STANDARDS OF REVIEW

¶ 18 The following standards of review apply to the issues raised by Killpack. First, "whether a jury instruction correctly states the law presents a question of law which we review for correctness."[4] Second, "we review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard."[5] Similarly, we review a trial court's decision to deny probation under an abuse of discretion standard and will overturn a sentencing decision only if it is " 'clear

that the actions of the [trial] judge were so *inherently unfair* as to constitute an abuse of discretion.' "[6]

## ANALYSIS

¶ 19 Having recited the key facts and established the standards of review applicable in this case, we will now examine each issue raised by Killpack on appeal.

I. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY REGARDING THE MEANING OF ACTING "RECKLESSLY" AS THE TERM IS USED IN THE CHILD ABUSE HOMICIDE STATUTE

¶ 20 Killpack first argues that the trial court improperly instructed the jury on the meaning of acting recklessly as an element of child abuse homicide. The Utah Code defines acting recklessly as being "aware of but consciously disregard[ing] a substantial and unjustifiable risk that . . . the result will occur."[7] The question raised here is which risk must a defendant be aware of and consciously disregard: the risk of inflicting serious physical injury or the risk of inflicting death?

¶ 21 We hold that acting recklessly, as used in the child abuse homicide statute, means that a defendant is aware of but consciously disregards a substantial and unjustifiable risk that her actions will result in child abuse by inflicting serious physical injury on the child. It does not require the State to prove that the defendant is aware of but consciously disregards the risk that her actions will result in the child's death. Therefore, the trial court properly included the jury instruction at issue.

¶ 22 Determining the meaning of recklessness is an issue of statutory interpretation. And we have long held that the primary rule in interpreting a statute is "to

3. The jury found her husband not guilty.

4. *State v. Houskeeper*, 2002 UT 118, ¶ 11, 62 P.3d 444.

5. *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120.

6. *State v. Rhodes*, 818 P.2d 1048, 1051 (Utah Ct.App.1991).

7. Utah Code Ann. § 76–2–103(3) (Supp.2007).

give effect to the intent of the legislature in light of the purpose the statute was meant to achieve."[8] The best evidence of the legislature's intent is "the plain language of the statute itself. When examining the statutory language, we assume the legislature used each term advisedly and in accordance with its ordinary meaning."[9] If, in reading the statute, the meaning of the language is clear, we need look no further to discern the legislature's intent. In this case, the meaning of the child abuse homicide statute, when read in harmony with the child abuse statute, which it references, is clear.

¶ 23 The contested jury instruction stated that the jury could convict Killpack of child abuse homicide only if, among other things, it found that Cassandra's "death was the result of child abuse committed recklessly as provided in subsection 76–5–109(2)," a subsection of the child abuse statute. Because the child abuse homicide statute explicitly references the child abuse statute, determining the meaning of recklessness as used in the former statute requires an interpretation of the latter.[10] Read together, the plain language of these two statutes leads us to conclude that the contested jury instruction correctly stated the law and was thus properly allowed.

¶ 24 Our analysis necessarily begins with the definition of recklessness. In its part entitled "Culpability Generally," the Utah Criminal Code defines acting recklessly as being "aware of but consciously disre-

gard[ing] a substantial and unjustifiable risk that . . . the result will occur."[11] The question in this case is which result: serious physical injury or death? The child abuse homicide statute provides that a person commits child abuse homicide if she "causes the death of" a child, and "the death results from child abuse . . . if done recklessly as provided in subsection 76–5–109(2)(b)."[12] Subsection 76–5–109(2)(b) of the child abuse statute provides that a person is guilty of child abuse if she "inflicts upon a child serious physical injury."[13] The only act the statute references is committing child abuse by inflicting serious physical injury. It does not mention causing the child's death. Read together, these two statutes clearly provide that a person is guilty of child abuse if she inflicts serious physical injury on a child. If she inflicts that serious physical injury recklessly and the injury results in the child's death, she has committed child abuse homicide. Because there is no requirement under the statute that the defendant act recklessly as to causing the child's death, the contested jury instruction correctly stated the law and was appropriately proffered to the jury.

## II. THE TRIAL COURT PROPERLY REJECTED KILLPACK'S PROPOSED JURY INSTRUCTIONS

¶ 25 We next examine two jury instructions that Killpack proposed but that the trial court rejected.

8. *State v. Bluff*, 2002 UT 66, ¶ 34, 52 P.3d 1210.

9. *State ex rel. Z.C.*, 2007 UT 54, ¶ 6, 165 P.3d 1206 (citations and internal quotation marks omitted).

10. The child abuse homicide statute explicitly requires that, in order to be guilty of child abuse homicide, a defendant must inflict child abuse "as defined in" the child abuse homicide statute. And the child abuse must be done recklessly "as provided in" the child abuse statute. Any interpretation of the mens rea required by the child abuse homicide statute thus relies on the language of the child abuse statute. Utah Code Ann. §§ 76–5–109, –208.

11. *Id.* § 76–2–103(3).

12. *Id.* § 76–5–208. Also instructive of this interpretation is subsection 76–5–208(1)(c) of the child abuse homicide statute, which provides

that the mental culpability required to commit child abuse homicide is the same mental culpability "as provided in" subsections 76–5–109(3)(a), (b), or (c). These subsections list the mental states for committing child abuse and include acting "intentionally," "recklessly," or "negligently." Again, the only reference to acting recklessly is in relation to committing child abuse through inflicting serious physical injury. There is no reference to causing the child's death.

13. Utah Code section 76–5–109(3) provides that "physical injury" of a child also constitutes child abuse. However, the child abuse homicide statute only references section 76–5–109(2), the subsection that refers to committing child abuse by inflicting serious physical injury. Thus our discussion centers on subsection 76–5–109(2).

## A. The Trial Court Properly Rejected Killpack's Proposed Jury Instruction Regarding a Parent's Reasonable Child Care Choices

¶ 26 Killpack's first proposed jury instruction is based on Utah Code section 62A–4a–201, a portion of the Utah Human Services Code.[14] This section provides that parents have a "fundamental" right to make decisions about how to raise their children. Based on the wording of the statute, Killpack proposed the following instruction:

> Parents have a fundamental liberty interest in the care, custody and management of their children, as protected by the 14th Amendment. Child abuse does not include injury that results from a parent's reasonable choices made in providing the care, custody and management of their children as viewed from the parent's standpoint.

¶ 27 The trial court rejected this instruction, noting that the section of the Utah Human Services Code that Killpack cited is "clearly a statement of general policy that has to do with situations where the State comes in and removes children from the home of their parents.... That's not the issue in this case."

¶ 28 While we could decline to address this issue based on Killpack's failure to properly brief it,[15] we nevertheless reach the merits of the issue and conclude that the trial court correctly refused this instruction because nothing in the Utah Human Services Code can be construed as a defense against child abuse.

¶ 29 Killpack attempts to justify this instruction by citing to Utah Code section 62A–4a–201(1)(a), which requires adequate procedures "be provided to parents if the state moves to challenge or interfere with parental rights." As Killpack argues, this section recognizes that parents possess a "fundamental liberty interest in the care, custody, and management" of their children. But Killpack is incorrect in suggesting that this section grants parents immunity from child abuse charges based on their parenting choices.

¶ 30 In the child abuse statute, the legislature has enumerated specific defenses to child abuse. Thus, a parent does not commit child abuse by (1) treating a child's medical condition by spiritual means in lieu of medical treatment, (2) treating a child's medical condition reasonably and with the best interest of the child in mind, and (3) imposing reasonable discipline or physical restraint on a child for specifically enumerated purposes such as self-defense.[16] The child abuse statute recognizes no defense against a charge of child abuse for, as Killpack proposed, "injury that results from a parent's reasonable choices made in providing the care, custody and management of their children." And even if we were to recognize this defense, Killpack would still have been required to prove that her treatment of Cassandra was "reasonable." In finding her guilty of child abuse homicide, the jury found that Killpack had behaved recklessly towards Cassandra and, therefore, necessarily concluded that Killpack's actions were not reasonable.

¶ 31 Because we find nothing to suggest that a fundamental interest in the care, custody, and management of a child gives parents the authority to commit acts that would otherwise be child abuse, we find that the trial court properly rejected Killpack's first proposed jury instruction.

## B. The Trial Court Properly Rejected Killpack's Proposed Jury Instruction Regarding a Parent's Treatment Options for a Child's Medical Condition

¶ 32 Killpack's second proposed jury instruction is based on the medical treatment

---

14. Utah Code Ann. § 62A–4a–201 (2006).

15. We note that Killpack's brief on this point wholly fails to comply with our well-established briefing requirements. In support of her argument, Killpack offers little more than a bare citation to section 62A–4a–201 of the Utah Human Services Code. There is no reasoned analysis of that authority, nor is there any substantive examination of the issue. In fact, Killpack's entire argument consists of one paragraph, half of which simply reprints the text of the rejected instruction. As such, we could properly disregard or strike this portion of Killpack's brief. Utah R.App. P. 24(j); see, e.g., Valcarce v. Fitzgerald, 961 P.2d 305, 313 (Utah 1998); Carrier v. Pro–Tech Restoration, 944 P.2d 346, 354 (Utah 1997).

16. Utah Code Ann. § 76–5–109(4)–(6) (Supp. 2007).

defenses provided for in the child abuse statute. Specifically, Killpack relied on the defense that "[a] parent or guardian of a child does not violate this section by selecting a treatment option for the medical condition of the child, if the treatment option is one that a reasonable parent . . . would believe to be in the best interest of the child." [17]

¶ 33 Killpack maintains that she was entitled to an instruction based on this defense for two reasons: (1) Reactive Attachment Disorder is a medical condition within the definition of the statute because it is listed in the DSM–IV (Diagnostic & Statistical Manual of Mental Disorders, 4th ed.), and (2) her actions (i.e., forcing Cassandra to drink an excessive amount of water) were the result of a "course of treatment prescribed, recommended, and/or approved by the mental health providers."

¶ 34 In rejecting Killpack's proposed instruction, the trial court focused on the definition of "medical condition" in the child abuse statute and held that "under these facts Reactive Attachment Disorder is not a medical condition." [18] While we affirm the trial court's decision to reject the proposed instruction, we wish to clarify that RAD *is* a medical condition for purposes of the child abuse statute.

¶ 35 Over the past several decades, healthcare professionals have made broad advances in the diagnosis and treatment of mental disease. Such illnesses are now recognized by both the medical community and the populace at large as conditions that may require medication and often intensive treatment by doctors. We find it unlikely that the legislature intended to exclude mental

illnesses from the definition of "medical condition." [19] Consequently, we hold that mental illnesses are "medical conditions" as that term is used in the child abuse statute.

¶ 36 Having determined that RAD fits within the definition of "medical condition," the next question is whether Killpack presented evidence sufficient that a jury could find that a reasonable parent would employ forced water ingestion in the excessive amount employed by Killpack as a treatment method for Cassandra's RAD. Given the paucity of evidence presented by Killpack at trial, the answer is clearly no. As such, the trial court was correct in rejecting this instruction.

¶ 37 Killpack did present some evidence in support of her "medical treatment" defense. Killpack's husband testified that prior to the events of June 9, 2002, he had discussed with Cascade's therapists an incident where the Killpacks had forced Cassandra to drink water as punishment for misbehavior. According to Killpack's husband, the therapist told Killpack that "two or three more times of that, and [Cassandra] should be fine."

¶ 38 Though minimal, this does constitute evidence on which a jury could have relied for finding that a reasonable parent would have used *some* measure of forced water ingestion as treatment for RAD. There is no evidence, however, on which a jury could have relied to find that a reasonable parent would have used the extreme amount of water Killpack forced into Cassandra on the night of June 9, 2002. Nor did Killpack present evidence to support a finding that a reasonable parent would have believed that such treatment was in the best interest of her child. [20]

17. *Id.*

18. The trial court further explained that the reason it did not consider RAD to be a medical condition was that neither the Killpacks nor their therapists considered it as such: "I don't see that anyone in that home treated this child's sneaking of the water or the drinking the sippy cup or sneaking of food as a medical problem or a medical condition."

19. While the Utah Code does not define the term "medical condition," other state courts addressing this issue have concluded that the term "medical" encompasses both mental and physi-

cal health. *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801, 809 n. 9 (1987) (explaining that a psychologist treating a patient for well-established psychological problems constitutes treating the patient for "medical" purposes); *cf. Madere v. State*, 2000–KA–00347–SCT ¶ 40 (Miss. 2001), 794 So.2d 200 (holding that the term "medical," as used in the hearsay exception regarding statements made for the purpose of medical diagnosis or treatment, includes emotional and mental health as well as physical health).

20. Killpack's husband testified that Killpack told him of an occasion prior to Cassandra's death when Killpack forced Cassandra to ingest water

¶ 39 Additionally, regardless of the jury instruction, Killpack was never precluded from mounting a full medical treatment defense based on the statute. Killpack had every opportunity to present evidence regarding Cassandra's medical condition, the treatment options she employed, and her belief in their efficacy and safety. In short, Killpack was permitted to fully present her defense that she was treating Cassandra's medical condition reasonably and doing so with the child's best interest at heart.

¶ 40 By finding Killpack guilty of child abuse homicide, the jury found that she recklessly disregarded a substantial risk of seriously injuring her child. In this case, the jury's finding of recklessness is incompatible with a conclusion that Killpack's treatment of Cassandra was reasonable. Consequently, even if we were to assume the trial court erred in rejecting Killpack's proposed instruction regarding reasonable treatment options for Cassandra's medical condition, Killpack was not harmed by the exclusion.

### III. THE TRIAL COURT PROPERLY ALLOWED EVIDENCE OF PRIOR BAD ACTS UNDER RULE 404(b)

¶ 41 Killpack next argues that under rule 404(b) of the Utah Rules of Evidence, the trial court erred by admitting evidence of her prior abuse of Cassandra. Specifically, Killpack claims that evidence of prior abusive episodes was not relevant to prove "recklessness" or any other element of child abuse homicide. Further, she claims that the evidence created prejudice against her in the minds of the jury members that outweighed the evidence's probative value.

¶ 42 According to the trial court, it admitted evidence of Killpack's prior abuse of Cassandra for two reasons: (1) the acts constituted "specific instances of the defendant's treatment of Cassandra and [we]re relevant . . . to establish a specific pattern of behavior by the defendant toward one particular child," and (2) the evidence of prior bad acts could be used to "prove absence of mistake or accident" on behalf of Killpack in causing Cassandra's death.[21]

¶ 43 We agree with the trial court's interpretation of the Utah Rules of Evidence and hold that it properly admitted evidence of Killpack's prior abuse of Cassandra.

¶ 44 Rule 404(b) of the Utah Rules of Evidence provides that

[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[22]

¶ 45 We have established a three-part test for determining the admissibility of evidence of prior crimes, uncharged misconduct, or bad acts. Such evidence is admissible if it (1) "is relevant to," (2) "a proper, non-character purpose," and (3) does not pose a "danger for unfair prejudice" that "substantially outweighs its probative value."[23] Consequently, evidence of a defendant's other crimes, wrongs, or bad acts may be admitted if such evidence "has 'a special relevance to a controverted issue and is introduced for a purpose other than to show

as punishment. Killpack explained that Cassandra spit up as a result, and her husband responded, "I'm not comfortable with that. Don't do that." Given Mr. Killpack's own discomfort with using a relatively minor amount of water when it resulted in adverse effects on Cassandra, it is unlikely the jury would have found that Killpack's use of the excessive amount of water on the night of Cassandra's death was a treatment option a reasonable parent would employ or believe to be in the child's best interest.

21. In its ruling allowing the evidence, the trial court held, "[t]here is nothing in the recklessness

definition that states that a defendant doesn't have to mean to do what he or she did—the reckless [element] goes to things other than just whether or not they meant to actually commit the very act."

22. *State v. Houskeeper,* 2002 UT 118, ¶ 28, 62 P.3d 444 (noting that the list of allowed noncharacter purposes in rule 404(b) is not exhaustive).

23. *State v. Widdison,* 2001 UT 60, ¶ 41, 28 P.3d 1278.

the defendant's predisposition to criminality.' "[24]

¶46 Our child abuse case law clearly indicates that evidence of instances of uncharged abuse involving the same victim and the same defendant is admissible for proper noncharacter purposes. For instance, in *State v. Reed*, we held that evidence of specific instances of uncharged child abuse may be properly admitted as noncharacter evidence under rule 404(b) when offered " 'to establish a specific pattern of behavior by the defendant toward one particular child, the victim.' "[25] Such evidence is often "indicative of the defendant's state of mind" and completes the story of the charged abuse.[26] Furthermore, evidence of prior child abuse is allowed "to show identity, intent or mental state, and lack of accident or mistake." [27]

¶47 At Killpack's trial, the burden fell on the State to prove each element of the crime of child abuse homicide as well as to counter Killpack's affirmative defense.[28] Killpack presented a two-fold defense. First, she argued that Cassandra died not from water intoxication but from accidental head trauma or, alternatively, that the intravenous solution given to Cassandra by the EMTs contributed to her symptoms. Second, she claimed that forcing Cassandra to drink excessive levels of water was part of a legitimate therapy to treat RAD and that Killpack did not know forced water ingestion could be harmful.

¶48 To counter these defenses, the State was justified in presenting evidence of Killpack's prior abuse of Cassandra. This evidence was used to rebut controverted issues and prove the elements of child abuse homicide by showing (1) that Cassandra's death was not an accident (2) that Killpack should have known the danger caused by forced water ingestion because she had previously seen Cassandra spit up and urinate uncontrollably as a result of drinking an excessive amount of water, and (3) that Killpack's prior abusive acts were not consistent with any reasonable medical treatment plan.

¶49 The evidence of prior abusive episodes was relevant in each of these respects. First, it was relevant to establishing that Cassandra's death was not an accident. Killpack's prior treatment of Cassandra included episodes of choking, hitting, and force-feeding, some of which resulted in serious injury to Cassandra. These incidents all tend to establish that Killpack had a specific pattern of disregarding substantial and unjustifiable risks of harm to her child, and thus her final act of forcing Cassandra to ingest an excessive amount of water was not an accident.

¶50 Second, the prior abusive episodes were relevant to establishing that Killpack knew of the danger of harm caused by forced

24. *State v. Featherson*, 781 P.2d 424, 426 (Utah 1989) (quoting *State v. Shickles*, 760 P.2d 291, 295 (Utah 1988)); *see also State v. Fedorowicz*, 2002 UT 67, ¶26, 52 P.3d 1194.

25. 2000 UT 68, ¶26, 8 P.3d 1025 (quoting *State v. Tanner*, 675 P.2d 539, 546 (Utah 1983)); *Tanner*, 675 P.2d at 546 (holding that in cases of child abuse, evidence of specific instances of a defendant's treatment of a child are relevant to establish specific patterns of behavior by the defendant toward one particular child, not merely a general disposition for violence or ill-will toward all children); *see also State v. Teuscher*, 883 P.2d 922, 927 (Utah Ct.App.1994) ("Evidence regarding prior instances of abuse perpetrated against the victim is clearly admissible in Utah to show identity, intent or mental state, and lack of accident or mistake.").

26. *Tanner*, 675 P.2d at 545 (internal quotation marks omitted). Killpack contends that *Tanner* is not controlling in this case because the issue in

*Tanner* was whether injuries sustained by a child were the result of an accident or an intentional act on the part of the defendant. Killpack's argument fails on two points: (1) Killpack claims that the death of her child was the result of an accident and not of her actions, and (2) prior bad acts can be used to show that a defendant was aware of a substantial and unjustified risk of injury just as they can be used to show intentional actions.

27. *Teuscher*, 883 P.2d at 927; *see Fedorowicz*, 2002 UT 67, 30, 52 P.3d 1194 ("Evidence is admissible under rule 404(b) to rebut a defense of accidental injury raised exclusively on cross-examination of the State's witnesses, irrespective of whether the defendant testifies or otherwise presents affirmative evidence of an accident.").

28. *Widdison*, 2001 UT 60, ¶41, 28 P.3d 1278 (admitting evidence of defendant's prior abuse of both victim and her other children to prove her identity as the abuser and that the child's injuries were "non-accidental").

water ingestion. Killpack claimed she was unaware of any risks associated with forcing Cassandra to drink an excessive amount of water and that she would not have taken such a risk had she been aware of it. Directly contradicting her claim, however, was the evidence that Cassandra had spit up when Killpack forced the child to ingest large quantities of water on previous occasions.

¶ 51 Finally, the evidence of prior abusive episodes was relevant to establishing that Killpack's treatment of Cassandra was not part of any reasonable medical treatment plan. As noted above, Killpack was aware of the risks associated with forcing Cassandra to drink an excessive amount of water because she had seen the negative physical repercussions when she employed forced water ingestion on prior occasions. Specifically, she witnessed Cassandra spit up and urinate uncontrollably.

¶ 52 Because these prior incidents of abuse were (1) relevant to (2) proper noncharacter purposes, the first two elements of the three-part test for admissibility are satisfied. We must now consider whether the evidence was more probative than prejudicial as required by rule 403. Rule 403 of the Utah Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 53 In determining whether evidence poses a danger of unfair prejudice that substantially outweighs its probative value, trial courts are required to consider several factors. Rule 403 does not require a trial court to dismiss all prejudicial evidence because " '[a]ll effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered.' " [29] Rather, the rule only requires that the trial court meas-ure the danger the evidence poses of causing "*unfair* prejudice" to a defendant.[30] Only when evidence poses a danger of "rous[ing] the jury to overmastering hostility" does it reach the level of unfair prejudice that rule 403 is designed to prevent.[31]

¶ 54 Though evidence of Killpack's prior abuse of Cassandra is certainly prejudicial—as is all evidence of abuse—the highly probative value of the evidence and its relevance to the issues controverted at trial justified the trial court in admitting the evidence under rule 402(b). Killpack has offered no convincing reason to distinguish her case from other child abuse homicide cases where trial courts properly admitted evidence of prior child abuse. Killpack also has not shown that the admitted evidence failed any prong of the three-part test. Therefore, we find that the trial court correctly admitted evidence of Killpack's prior bad acts.

## IV. THE REQUIREMENTS OF THE CUMULATIVE ERROR DOCTRINE ARE NOT MET

¶ 55 Killpack contends that even if no harm was caused by the trial court's errors individually, the combined effect of those errors is such that her conviction should be reversed under the cumulative error doctrine.

¶ 56 A reviewing court will reverse a jury verdict under the cumulative error doctrine only " 'if the cumulative effect of the several errors undermines ... confidence that a fair trial was had.' " [32] If, however, we determine that a defendant's claims do not constitute errors on the part of the trial court, then it follows that the requirements of the cumulative error doctrine are not met. As discussed, Killpack has failed to show that any of the trial court's actions amount to error. Thus, there was no cumulative error in this case.

**29.** *Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552 (quoting *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989)).

**30.** *Id.* (emphasis added).

**31.** *State v. Reed*, 2000 UT 68, ¶ 29, 8 P.3d 1025.

**32.** *State v. Widdison*, 2001 UT 60, ¶ 73, 28 P.3d 1278 (omissions in original) (quoting *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993)).

## V. THE TRIAL COURT ACTED WITHIN ITS DISCRETION IN DENYING KILLPACK'S REQUEST FOR PROBATION

¶ 57 We now turn to the fifth and final issue on appeal. Killpack argues that her one-to-fifteen year prison sentence was "inherently unfair and clearly excessive under a totality of the facts." Killpack maintains that in light of several mitigating factors—including that she lacked any previous criminal history, displayed "a cooperative attitude," showed an ability for rehabilitation, and that imprisonment would "entail excessive hardship" on her husband and children—the trial court "abused [its] discretion in choosing prison over probation." For the reasons outlined below, we affirm the trial court's sentencing decision.

¶ 58 We have traditionally afforded trial courts "wide latitude and discretion in sentencing," [33] recognizing that they are best situated to weigh the many "intangibles of character, personality and attitude, of which the cold record gives little inkling." [34] Consequently, the decision of whether to grant probation "must of necessity rest within the discretion of the judge who hears the case." [35]

¶ 59 In general, a trial court's sentencing decision will not be overturned "unless it exceeds statutory or constitutional limits, the judge failed to consider all the legally relevant factors, or the actions of the judge were so inherently unfair as to constitute abuse of discretion." [36] Although courts must consider all legally relevant factors in making a sentencing decision, not all aggravating and mitigating factors are equally important, and "[o]ne factor in mitigation or aggravation may weigh more than several factors on the opposite scale." [37] Thus, several mitigating circumstances claimed by a defendant may be outweighed by a few egregious aggravating factors.

¶ 60 The trial court in this case pointed to two aggravating factors that, in its opinion, outweighed the mitigating factors outlined by Killpack: (1) the "catastrophic events of the last week of Cassandra's life," including the "last struggle" between Killpack and Cassandra that resulted in the child's death; and (2) the fact that Killpack failed to "acknowledge full responsibility for her actions." The trial court placed particular emphasis on the "power struggle" between Killpack and Cassandra which "involved denial of food and other privileges, a torturous week of therapy at a clinic ... and a final confrontation" where Killpack "somehow forced [Cassandra] to ingest four quarts of water or more." In opining on these events, the trial court stated that it "greatly fear[ed] that [Cassandra] suffered far more than we will ever understand."

¶ 61 In light of the careful consideration by the sentencing court of all mitigating and aggravating factors and its clear articulation of the reasons for its decision, we cannot say that the court abused its discretion in denying Killpack's request for probation.

## CONCLUSION

¶ 62 In conclusion, we hold the following points of law. First, to prove a defendant has acted recklessly under the child abuse homicide statute, the State need only prove that the defendant consciously disregarded the risk of committing child abuse by inflicting serious physical injury, not that she consciously disregarded the risk of causing the child's death. Second, because Killpack failed to present sufficient evidence to satisfy the medical treatment defense, she was not entitled to a medical treatment defense jury instruction. Third, the evidence of Killpack's prior abuse of Cassandra was properly allowed under rule 404(b) of the Utah Rules of

**33.** *State v. Woodland,* 945 P.2d 665, 671 (Utah 1997).

**34.** *State v. Sibert,* 6 Utah 2d 198, 310 P.2d 388, 393 (1957); *see also State v. Rhodes,* 818 P.2d 1048, 1049 (Utah Ct.App.1991).

**35.** *Sibert,* 310 P.2d at 393.

**36.** *State v. Sotolongo,* 2003 UT App 214, ¶ 3, 73 P.3d 991 (citations and internal quotation marks omitted).

**37.** *State v. Russell,* 791 P.2d 188, 192 (Utah 1990).

Evidence because it was relevant to a proper, noncharacter purpose, and it did not pose a danger of unfair prejudice that substantially outweighed its probative value. Fourth, because we have found no error in this case, the requirements of the cumulative error doctrine are not met. Finally, the trial court did not abuse its discretion by denying Killpack probation. Consequently, we affirm Killpack's conviction and sentence.

---

¶ 63 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.